14-1587

_____

# United States Court of Appeals for the Federal Circuit

_____

## MAYFAIR WIRELESS, LLC
*Plaintiff-Appellant,*

v.

## CELLCO PARTNERSHIP (d/b/a VERIZON WIRELESS); AT&T MOBILITY LLC; T-MOBILE USA; AND SPRINT NEXTEL CORPORATION
*Defendants-Appellees.*

_____

On appeal from the United States District Court for the District of Delaware, No. 1:11-cv-00772, Chief Judge Gregory M. Sleet.

_____

## BRIEF FOR PLAINTIFF-APPELLANT

_____

September 2, 2014

Daniel Kotchen
Michael von Klemperer
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC  20009
Telephone:  (202) 471-1995

*Attorneys for Plaintiff-Appellant*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, Appellant Mayfair Wireless, LLC ("Mayfair") hereby files the following Certificate of Interest:

1.     Counsel for Mayfair represents only one party in this case, the Appellant Mayfair Wireless, LLC.

2.     The Appellant named in the case caption, Mayfair Wireless, LLC, is the real party in interest.

3.     Mayfair has no parent company and no publicly held entity holds 10% or more of its stock.

4.     The following attorneys and law firms appeared for Mayfair before the lower tribunal and/or are expected to appear for Mayfair before this Court: Daniel A. Kotchen, Daniel L. Low, Michael von Klemperer, Robert Klinck, and Justin Ervin of Kotchen & Low LLP, and Brian E. Farnan and Rosemary Piergiovanni of Farnan LLP.

/s/ Daniel Kotchen
Daniel Kotchen
Michael von Klemperer
KOTCHEN & LOW LLP
1745 Kalorama Road NW,
Suite 101
Washington, DC  20009
Telephone:  (202) 471-1995
Facsimile:  (202) 280-1128
dkotchen@kotchen.com
mvk@kotchen.com

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ................................................................. i

TABLE OF CONTENTS ......................................................................... ii

TABLE OF AUTHORITIES ................................................................... iv

STATEMENT OF RELATED CASES ................................................... vii

STATEMENT OF JURISDICTION ..........................................................1

STATEMENT OF THE ISSUES ...............................................................1

STATEMENT OF THE CASE SETTING OUT THE FACTS RELEVANT TO THE ISSUES ...........................................................................................1

SUMMARY OF THE ARGUMENT .......................................................7

ARGUMENT ..........................................................................................10

I.   The District Court Erroneously Considered Pre-Issuance Challenges To The Chain Of Title. ......................................................................................12

II.   Even If It Were Permissible To Consider A Pre-Issuance Chain Of Title Challenge, The District Court Did Not Correctly Apply A Presumption That The Patentee Owned The Patent Upon Issuance. .......................................................16

III.   The District Court Erred In Finding That The Existence Of A Bill Of Sale From A UCC Foreclosure Sale Was Required To Substantiate The Presumption That Technology Alternative Owned The '441 Patent ........................................19

IV.   The District Court's Conclusion That The Patent Act Preempts State UCC Law Is Contrary To Federal Circuit Precedent .....................................................21

V.   The District Court Incorrectly Concludes That Mayfair Was Not A *Bona Fide* Purchaser For Value. ....................................................................................27

CONCLUSION ......................................................................................29

ADDENDUM I - THE DECISION OF THE COURT BELOW ............31

ADDENDUM II - U.S. PATENT NO. 6,587,441 .................................65

CERTIFICATE OF SERVICE ...............................................................87

CERTIFICATE OF COMPLIANCE........................................................................91

# TABLE OF AUTHORITIES

## Cases

*Abbott Labs v. Diamedix Corp.*, 47 F.3d 1128 (Fed. Cir. 1995) .............................13

*Abraxis Biosci., Inc. v. Navinta LLC*, 625 F.3d 1359 (Fed. Cir. 2010) ...................22

*Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, No. 98 Civ. 7766 (PAC), 2007 WL 1552395 (S.D.N.Y. May 29, 2007).........................................15

*Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991)............... 13, 14

*Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423 (S.D.N.Y. 2002)...17

*Ballentine v. United States*, 486 F.3d 806 (3rd Cir. 2007) ............................... 10, 11

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 487 F. Supp. 2d 1099 (N.D. Cal. 2007)................................................................ 17, 28

*Bellehumeur v. Bonnett*, 127 F. App'x. 480 (Fed. Cir. 2005) ..................................17

*Bryant v. Am. Nat'l Bank and Trust Co. of Chicago*, 407 F. Supp. 360 (N.D. Ill. 1976) .......................................................................................................................26

*Chesapeake Fiber Packaging Corp. v. Sebro Packaging Corp.*, 143 B.R. 360 (D. Md. 1992)...............................................................................................................17

*Common Cause of Penn. V. Pennsylvania*, 558 F.3d 249 (3d. Cir. 2009) ..............10

*Dorr-Oliver, Inc. v. United States*, 432 F.2d 447 (Ct. Cl. 1970).............................15

*Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333 (Fed. Cir. 2010)...............22

*Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991)..................9, 27

*Gellman v. Telular Corp.*, 449 F. App'x 941 (Fed. Cir. 2011) ................................10

*Gould Elec. Inc. v. United States*, 220 F.3d 169 (3rd Cir. 2000) ..................... 10, 11

*Hypoxico Inc. v. Colo. Altitude Training*, 630 F. Supp. 2d 319 (S.D.N.Y. 2009) ..20

*In re Schering Plough Corp.*, 678 F.3d 235 (3rd Cir. 2012) ...................................10

*Int'l Assoc. of Machinists v. Nw Airlines, Inc.*, 673 F.2d 700 (3rd Cir. 1982) ........11

*Kahn v. Gen. Motors Corp.*, No. 88 Civ. 2982 (HB), 1995 WL 2135 (S.D.N.Y. Jan. 3, 1995) ..............................................................................................................15

*Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406 (3rd Cir. 1991) ....................10

*Kono Mfg. Co. v. Vogue Optical Mfg. Co.*, 94 F. Supp. 251 (S.D.N.Y. 1950) .......20

*Korogluyan v. Chicago Title and Trust Co.*, 572 N.E.2d 1154 (Ill. App. Ct. 1991) ................................................................................................................................26

*Mabbett v. Tandy Corp.*, 847 F.2d 841 (Fed. Cir. 1988) .....................................9, 28

*Madey v. Duke Univ.*, 307 F.3d 1351 (Fed. Cir. 2002) ...........................................10

*Matter of Franklin*, 709 F. Supp. 109 (E.D. Va. 1989) ..........................................21

*Matter of Pubs, Inc. of Champaign*, 618 F.2d 432 (7th Cir. 1980) ............ 21, 24, 25

*Mercantile Nat'l Bank of Chicago v. Howmet Corp.*, 524 F.2d 1031 (7th Cir. 1975) ............................................................................................................................ 15, 16

*Morrow v. Microsoft Corp.*, 499 F.3d 1332 (Fed. Cir. 2007)........................... 14, 15

*Nat'l Bond & Inv. Co. v. Shirra*, 255 Ill. App. 415 (Ill. App. Ct. 1930) .................25

*Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757 (Fed. Cir.1988) .....................23

*Routen v. West*, 142 F.3d 1434 (Fed. Cir. 1998).......................................................17

*Sigma Eng'g Serv. Inc. v. Halm Instrument Co.*, 33 F.R.D. 129 (E.D.N.Y. 1963).15

*SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319 (Fed. Cir. 2010) ..............28

*Sky Tech. LLC v. SAP AG*, 576 F.3d 1374 (Fed. Cir. 2009)......................... 9, 22, 23

*Speedplay v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000).......................................13

*Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379 (Fed. Cir. 2002) .................................10

**Statutes**

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1295(a)(1).....................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1338(a) ..........................................................................1

35 U.S.C. § 100(d) ........................................................... 7, 12, 14

35 U.S.C. § 151 ...............................................................................12

35 U.S.C. § 152 ................................................................ 7, 12, 14

35 U.S.C. § 281 ................................................................ 7, 12, 14

**Other Authorities**

Black's Law Dictionary (8th ed. abrid. 2005) .....................................8, 20

**Rules**

Fed. R. App. P. 4 ...............................................................................1

Fed. R. Civ. P. 12(b)(1).....................................................................10

Fed. R. Evid. 301 ..............................................................................8, 17

Fed. R. of Evid. 1004 ........................................................................21

**Treatises**

Donald S. Chisum, *Chisum on Patents* ...................................................15

## STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, Mayfair hereby advises the Court that (a) no prior appeal has been taken in this civil action before the Federal Circuit or any other appellate court, and (b) no other case known to counsel for Mayfair is currently pending that will directly affect or be directly affected by the Federal Circuit's decision in this appeal.

## STATEMENT OF JURISDICTION

The District Court and this Court have subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the patent laws of the United States.  This Court has appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 1295(a)(1) because this is an appeal from a final decision of the District Court dismissing Appellant Mayfair Wireless LLC's ("Mayfair") civil action for patent infringement.

The District Court entered the order from which appeal 14-1587 was taken on June 3, 2014.  Mayfair timely filed its Notice of Appeal on June 27, 2014.  *See* Fed. R. App. P. 4.

## STATEMENT OF THE ISSUES

1.    Whether the District Court erroneously concluded that Mayfair lacked standing to assert infringement of the patent-in-suit and dismissed Mayfair's complaint.

## STATEMENT OF THE CASE
## SETTING OUT THE FACTS RELEVANT TO THE ISSUES

Gooitech was a technology company formed by brothers Chris and Andrew Solomon, and their father – James Solomon – served as CEO.  Hinsdale Bank & Trust Company had extended financing to Gooitech, taking a security interest in Gooitech's assets.    Joint  Appendix  A160-A165  ("A160-A165")  (Security

1

Agreement).    The Security Agreement covered all existing and after-acquired assets, making it applicable to any patent application.  A161 (Security Agreement), A13.  Six employees of Gooitech Inc. developed a method and apparatus for data transfer over various wireless networks.  The six inventors filed an application for a patent with the United States Patent and Trademark Office ("PTO"), and assigned the application to Gooitech.    A45 (listing inventors), A139 (sworn statement of Gooitech CEO stating, "the initial assignee (through agreements with its employee inventors) was Gooitech"), A132 (inventor affidavit), A142 (same) A145 (same), A148 (same), A151 (same), A154 (same), A157 (same).    The application ultimately issued as United States Patent Number 6,587,441 ("the '441 Patent").  A45-A65.

Gooitech subsequently defaulted on its loan, and Hinsdale foreclosed on the assets covered by the security agreement, including the patent application.  A139 ("Subsequently, Hinsdale Bank took possession of Gooitech's rights [to the '441 Patent application] through execution of a security interest in the same.").  Hinsdale subsequently purchased the patent application at a sale under Illinois's Uniform Commercial Code ("UCC").  A378 (Notice of UCC Sale).

Hinsdale Bank sold the '441 Patent application to Sierra Strategic Consulting, Inc.  A171-A172.  Sierra assigned the patent to 3P Networks, an organization owned and run by James Solomon.  A174-A175, A4.  3P Networks

2

subsequently transferred its rights, title, and interest in the application to Technology Alternatives, Inc. ("Technology Alternatives"), an organization owned by Mr. Solomon and Paul Masanek. A177-A179. Technology Alternatives then took over prosecution of the patent application, and the PTO ultimately issued the '441 Patent to Technology Alternatives. A45.

After the '441 Patent issued, Technology Alternatives entered into business relationships with Services by Designwise and TechAlt, Inc. ("TechAlt"). After a dispute arose between the entities, Services by Designwise and Services by Designwise's president Paul Masanek sued Technology Alternatives, TechAlt, and the CEO and president of both Technology Alternatives and TechAlt James Solomon. A209, A240-A241. The three corporations and two individuals resolved this dispute through a settlement agreement, which expressly incorporated a number of "Related Agreements." A209-A210, A235 (¶ 21.7). As part of the settlement, Technology Alternatives became a wholly owned subsidiary of TechAlt. A211. One of the Related Agreements was a Security Agreement executed by TechAlt and Services by Designwise on November 19, 2004. A20, A182. The Security Agreement granted a security interest in all of TechAlt's assets and included an exhibit listing intellectual property, including the '441 Patent, that was included as collateral. A181-A182 ("the DEBTOR hereby grants the SECURED PARTY a security interest in … All of DEBTOR's … patents"),

3

A198 (exhibit listing intellectual property, including "US Patent No. 6,587,441"). Services by Designwise prepared a UCC Financing Statement documenting the security interest and filed a copy of that document with the PTO. A203, A207.

TechAlt subsequently defaulted on its obligations, and Services by Designwise filed an action for replevin, seeking to foreclose upon the collateral included in the November 19, 2004 Security Agreement. A244-A245. TechAlt and all of its remaining officers and executives (including James Solomon) and Services by Designwise and its president Paul Masanek settled the action, with TechAlt agreeing to the replevin. A243-A260 (Settlement Agreement). The Circuit Court of Cook County, Illinois, entered an order of replevin, allowing Services by Designwise to take possession of the collateral. A327-A328. Services by Designwise then conducted a UCC sale and purchased the assets at that sale, including the '441 Patent. A330-A332. There were no objections to the UCC sale.

Commonwealth Research Group ("CRG") purchased the '441 Patent from Services by Designwise on July 7, 2009. A334-A342. As part of that agreement, CRG agreed to pay Services by Designwise $150,000. A335. CRG paid that fee. A380, ¶ 3. At the time that it purchased the '441 Patent, CRG was not aware of any defects in the chain of title. A380, ¶ 4

Mayfair filed a patent infringement complaint on September 1, 2011 asserting that Cellco Partnership (d/b/a Verizon Wireless), AT&T Mobility LLC,

4

T-Mobile USA, Inc., and Sprint Nextel Corporation (collectively the "Appellees")
infringe the '441 Patent. Compl. (Dkt No. 1).[1]  On November 14, 2011, Appellees
moved to dismiss the complaint for lack of subject matter jurisdiction, arguing that
Mayfair lacked standing. Appellees' Mot. to Dismiss (Dkt. No. 17). Mayfair
opposed the motion on December 1, 2011. Appellant's Opp'n (Dkt. No. 28). On
August 30, 2013, Magistrate Judge Sherry R. Fallon issued a Report &
Recommendation, recommending that Appellees' motion should be granted. A2-
A25 (Report & Recommendation).

In finding that Mayfair lacked standing, Magistrate Fallon found that
sufficient evidence did not exist to support that the PTO correctly issued the '441
Patent to Technology Alternatives. Specifically, Magistrate Fallon noted that a
presumption applied that, as the patentee, Technology Alternatives held legal title
to the patent, but nonetheless concluded that "Defendants have overcome the
presumption by demonstrating a lack of evidence in support of Mayfair's
contention that Technology Alternatives, Inc. is a proper assignee." A9. In

---

[1] Mayfair, CRG's successor in interest, was first put on notice of alleged defects in
the title shortly before Cisco Systems filed a motion to dismiss a prior infringement
action involving the '441 Patent. A381, ¶ 8. Mayfair opted to dismiss the prior
action to investigate the alleged defects in title. A381, ¶ 9. After dismissing that
action but before filing this action, and in order to address arguments raised by
Cisco, Mayfair obtained assignments from each of the named inventors and from
James Solomon and Paul Masanek. A141-A142, A144-A145, A147-A148, A150-
A151, A154-A155, A156-A157.

particular, Magistrate Fallon found that the lack of a "bill of sale" listing the '441 Patent application as being transferred from Gooitech to Hinsdale Bank (prior to Hinsdale Bank transferring the patent to Technology Alternatives) left "the court to speculate that Hinsdale purchased the '441 Patent application at the sale."  A13. Magistrate Fallon noted the existence of a security agreement encompassing the patent application between Gooitech and Hinsdale Bank, which was filed with the PTO, and a sworn statement from Mr. Solomon confirming that Hinsdale Bank took possession of Gooitech's right to the patent application, which was also filed with the PTO.  A13.  But she was still left "to speculate" that the '441 Patent application had in fact transferred to Hinsdale Bank by the absence of a bill of sale. A13.

Magistrate Fallon also found that, after the '441 Patent issued to Technology Alternatives, the transfer of the Patent to Services by Designwise in the course of a UCC foreclosure sale was fatally flawed because a proper written assignment did not exist as required by the Patent Act, and the Patent Act preempts state UCC foreclosure law (which does not require a written assignment).  A19-A22.

Finally, Magistrate Fallon found that CRG (Mayfair's predecessor) was not a *bona fide* purchaser because CRG did not take possession of the '441 Patent from a party who held legal title, and that CRG was on constructive notice of defects in the chain of title.  A23-A24.

On June 3, 2014, the District Court adopted Magistrate Fallon's Report & Recommendation in whole and without comment and dismissed Mayfair's complaint. A1 (Order Adopting Magistrate Judge's Recommendation). Mayfair timely filed its Notice of Appeal on June 27, 2014.

## SUMMARY OF THE ARGUMENT

1. The District Court erred by disregarding the statutory scheme vesting legal title in the '441 Patent in Technology Alternatives. The '441 Patent issued to Technology Alternatives pursuant to 35 U.S.C. § 152. Thus, Technology Alternatives was the "patentee." *See* 35 U.S.C. § 100(d) ("The word 'patentee' includes not only the patentee *to whom the patent issued* but also the successors in title to the patentee.") (emphasis added). Technology Alternatives thus held legal title to the '441 Patent. *See, e.g.,* 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent."). In light of this statutory scheme, the District Court erred in finding that Technology Alternatives did not hold title to the '441 Patent.

2. Rather than finding that – as the organization to which the '441 Patent issued – Technology Alternatives was the "patentee" vested with legal title to the '441 Patent, the District Court instead applied a "presumption" that Technology Alternatives owned the Patent. But the District Court then found that Defendants overcame the "presumption" by "demonstrating a lack of evidence" of assignment.

7

A9.  It is black letter law that a presumption cannot be overcome by a lack of evidence, and "the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption."  Fed. R. Evid. 301; *see* Black's Law Dictionary 995 (8th ed. abrid. 2005) (defining "rebuttable presumption" as "an inference drawn from certain facts that establish a prima facie case, which may be overcome by the introduction of contrary evidence").

3.    Even if the District Court were correct that an evidentiary presumption could be overcome by a "lack of evidence," the District Court erred in finding that there was no evidence to substantiate the transfer of the '441 Patent application from Gooitech to Hinsdale Bank.  Considerable evidence exists to substantiate the transfer from Gooitech to Hinsdale Bank, including the Gooitech CEO's sworn statement filed with the PTO stating that the '441 was taken by Hinsdale as part of foreclosure proceedings.  The District Court ignored this evidence and instead found that Mayfair's inability to produce (at the initial stage of the case and without the benefit of discovery) a bill of sale from the foreclosure proceeding listing the '441 Patent application was sufficient to defeat the presumption of ownership.  In other words, the District Court sought conclusive proof of ownership to validate the presumption that Technology Alternatives was indeed the true patentee to which the '441 Patent issued.

4.    The District Court's incorrectly concluded that the Patent Act

8

preempted Illinois UCC law, and that, accordingly, Technology Alternatives did not transfer title of the '441 Patent to Services by Designwise. The District Court's decision is contrary to *Sky Technologies LLC v. SAP AG*, in which this Court held that "no federal law preempts the use of [state] UCC [law] to transfer patent ownership by operation of law." 576 F.3d 1374, 1381 (Fed. Cir. 2009). Correctly applying *Sky Technologies*, Appellees did not, and cannot, dispute that Technology Alternatives transferred title to the '441 Patent to Services by Designwise through a valid UCC sale under Illinois UCC law.

5.      The decision of the Court below was contrary to law in concluding that CRG (Mayfair's predecessor) did not qualify as a *bona fide* purchaser. First, the Court concluded that Mayfair was not a *bona fide* purchaser because it did not take title from an entity that held legal title to the '441 Patent. This was erroneous and contrary to the precedent of this Court. *See Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572-75 (Fed. Cir. 1991) (indicating that *bona fide* purchaser rule could apply even where the seller lacked legal title). Second, the Court concluded that CRG was on constructive notice of defects in the chain of title at the time of purchase because only two of the six inventors recorded their assignments with the PTO. This was erroneous, as an assignment is valid even if not recorded with the PTO, *see Mabbett v. Tandy Corp.*, 847 F.2d 841, at *2 n.2 (Fed. Cir. 1988) (A654), *and* ample other evidence clearly supported the chain of

9

title.

## ARGUMENT

The District Court dismissed Mayfair's Complaint for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). Because a dismissal for lack of subject matter jurisdiction is a question of law, this Court reviews the District Court's decision *de novo*. *Common Cause of Penn. v. Pennsylvania*, 558 F.3d 249, 257 (3d. Cir. 2009); *Toxgon Corp. v. BNFL, Inc.*, 312 F.3d 1379, 1380-81 (Fed. Cir. 2002).

"A claim may be dismissed under Rule 12(b)(1) only if it 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction' or is 'wholly insubstantial and frivolous.'" *Gould Elec. Inc. v. United States*, 220 F.3d 169, 178 (3rd Cir. 2000) (quoting *Kehr Packages, Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3rd Cir. 1991)).[2] In deciding a Rule 12(b)(1) motion based on a facial challenge, "the Court must accept as true all material allegations set forth in the complaint, and must construe those facts in favor of the nonmoving party." *Ballentine v. United States*, 486 F.3d 806, 810 (3rd Cir. 2007); *see In re Schering Plough Corp.*, 678 F.3d 235, 243 (3rd Cir. 2012). While the plaintiff bears the

---

[2] "A dismissal for lack of subject matter jurisdiction is a procedural question not unique to patent law, and so th[e Federal Circuit] follows the law of the regional circuit." *Gellman v. Telular Corp.*, 449 F. App'x 941, 943 (Fed. Cir. 2011) (citing *Madey v. Duke Univ.*, 307 F.3d 1351, 1358 (Fed. Cir. 2002)) (A647).

initial burden of pleading the elements of standing, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Ballentine*, 486 F.3d at 810 (citation omitted). However, if the defendant challenges the facts alleged in the pleadings, the defendant must affirmatively present evidence rebutting the plaintiff's allegations. *Gould Elec. Inc.*, 220 F.3d at 177; *Int'l Assoc. of Machinists v. Nw Airlines, Inc.*, 673 F.2d 700, 712 (3rd Cir. 1982). Plaintiff must then respond with evidence supporting jurisdiction. *Gould Elec. Inc.*, 220 F.3d at 177. "[I]f there is a dispute of material fact, the court must conduct a plenary trial on the contested facts prior to making a jurisdiction determination. *Id.*

As discussed further below, the decision of the District Court is erroneous for at least five reasons: (1) the District Court erroneously considered pre-patent-issuance challenges to the '441 Patent's chain of title, (2) even if it were permissible to consider pre-issuance chain of title arguments, the District Court failed to correctly apply a presumption that the patentee – *i.e.*, the organization to which the Patent issued – was the legal title holder at issuance, (3) the District Court erroneously concluded that there was insufficient evidence to substantiate the transfer of title from Gooitech Inc. to Hinsdale Bank, (4) the District Court erroneously found that, contrary to *Sky Technologies*, the Patent Act preempts state UCC law, and (5) the District Court erroneously found that CRG (Mayfair's predecessor) was not a *bona fide* purchaser.

11

In sum, if upheld, the District Court's decision would fundamentally alter the law governing the transfer of patents. The statutory framework regarding who is a "patentee" would be rendered meaningless. State laws (such as foreclosure or probate laws) regarding the transfer of property would no longer apply to patents. Transfer of patents could be proven only if a written assignment currently exists, such that a fire destroying an assignment would extinguish rights to a patent. Transfer of patents through the operation of intestate laws would also be nullified, effectively leaving patents ownerless where the patentee dies intestate. The pledging of patents as collateral in financing agreements would also be upended, as parties would be unable to rely on established state foreclosure procedures in the event of default. Simply put, the District Court's findings are wrong as a matter of law.

## I.    The District Court Erroneously Considered Pre-Issuance Challenges To The Chain Of Title.

The District Court erred in allowing Appellees to challenge to the pre-issuance chain of title. The patent statutes provide that a patent may be issued *either* to a patent applicant (*e.g.*, inventor) pursuant to 35 U.S.C. § 151 *or* to an assignee of the patent application pursuant to 35 U.S.C. § 152. The person to whom the patent is issued – whether under § 151 or § 152 – is known as the "patentee." *See* 35 U.S.C. § 100(d) ("The word 'patentee' includes not only the patentee *to whom the patent issued* but also the successors in title to the patentee.")

(emphasis added). The statute conferring the right to sue focuses upon the "patentee." *See* 35 U.S.C. § 281 ("A patentee shall have remedy by civil action for infringement of his patent."). The District Court correctly notes that: (1) the statutory framework vests the "patentee" with the right to sue, (2) the statute defines the term patentee to mean the party to whom the patent is issued and its successors, and (3) the patent-in-suit was issued to Technology Alternatives, Inc. under 35 U.S.C. § 152. A7-A9. This Court has confirmed what is obvious from the statutes – legal title initially vests in the party to whom the patent is issued. *See, e.g.*, *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1249-50 (Fed. Cir. 2000) ("A party may bring an action for patent infringement only if it is the 'patentee,' *i.e.*, if it owns the patent, either *by issuance* or by assignment.") (emphasis added); *Abbott Labs v. Diamedix Corp.*, 47 F.3d 1128, 1130 (Fed. Cir. 1995) (stating that the "patentee" includes "the party to whom the patent was issued" and any successors to that party); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.2 (Fed. Cir. 1991) ("The entity to whom the grant of a patent is made by the PTO [or that entity's successor in title] holds the 'legal title' to the patent.") (alteration in original) (citations omitted). And the *Arachnid* Court explicitly stated that the "patentee" may or may not be the inventors: "The legal title holder may or may not be the inventor, according to whether provision has been made by the inventor for issuance to an assignee." 939 F.2d at 1578 n.2.

13

The District Court did not address how the statutory framework allows for Appellees to challenge standing based upon alleged breaks in the pre-issuance chain of title. The Court simply *assumed* that such challenges are allowed. A9-A10. This assumption is contrary to the statutory framework and case law.[3] Under the statutory framework and the case law, the standing inquiry begins with the party to whom the patent was issued – here Technology Alternatives – and an accused infringer may not challenge standing by asserting defects in the chain of title from prior to the issuance. *See* 35 U.S.C. §§ 100(d), 152, 281; *Arachnid, Inc.*, 939 F.2d at 1578 n.2 ("'Legal title holder' is synonymous with 'patentee' as defined by 35 U.S.C. § 100(d)"). Any breaks in the chain of title from prior to the patent's issuance give rise only to *equitable* rights held by third parties,[4] which

---

[3] The District Court appears to conflate equitable and legal rights to a patent. Under the statutory framework, the *only* relevant inquiry is whether Technology Alternatives, Inc. held legal title. *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007) (explaining that the "patentee," *i.e.* "the party holding *legal title* to the patent," may "bring a civil action for infringement.") (emphasis in original) The fact that some other entity may have an equitable claim (*i.e.,* that it should be the owner of the patent) is irrelevant to the question of who holds the right to sue for infringement. *See, e.g.*, *Arachnid, Inc.*, 939 F.2d at 1579-80 (noting that the owner of the equitable title may seek redress in a court of equity, but may not bring an action at law for infringement – a right reserved for the legal title holder).

[4] A party with an equitable interest in a patent can assert its interest in a lawsuit against the legal title holder (*e.g.*, bringing a breach of contract suit seeking specific performance to transfer the legal ownership of the patent). *See, e.g.*,

Appellees may not use to challenge Mayfair's standing.  "It has long been settled that a third party's equitable rights in a patent may not be asserted as a defense in an action for infringement brought by the owner of title to the patent." *Mercantile Nat'l Bank of Chicago v. Howmet Corp.*, 524 F.2d 1031, 1034 (7th Cir. 1975) (rejecting defense based on third party rights and compiling cases); *Dorr-Oliver, Inc. v. United States*, 432 F.2d 447, 451 (Ct. Cl. 1970) (explaining "[i]n patent litigation between private parties, equitable rights of ownership of strangers to the suit cannot be raised as defenses against the legal title holder of a patent"); *see also Advanced Magnetic Closures, Inc. v. Rome Fastener Corp.*, No. 98 Civ. 7766 (PAC), 2007 WL 1552395, at *7 (S.D.N.Y. May 29, 2007) ("When the plaintiff is the patentee, however, "it is no defense that the [plaintiff] obtained or retains title in breach contractual or other obligation to another … [s]uch equitable 'interests' do not defeat standing to sue for infringement'") (citing 8 Donald S. Chisum, *Chisum on Patents* § 21.03) (A637-A638);  *Kahn v. Gen. Motors Corp.*, No. 88 Civ. 2982 (HB), 1995 WL 2135, at *4 (S.D.N.Y. Jan. 3, 1995) (explaining that where plaintiff "proved *prima facie* his legal title to the patent … [i]t would be unfair to allow [defendant] to hide behind the putative rights of a non-party") (A651); *Sigma Eng'g Serv. Inc. v. Halm Instrument Co.*, 33 F.R.D. 129, 130

---

*Morrow*, 499 F.3d at 1343.  The right to sue for infringement always remains with the legal title holder of the patent.  *Id.* at 1339, 1343.

(E.D.N.Y. 1963).  Here, Appellees do not assert that they have any equitable rights to the '441 Patent.  Accordingly, the Court's consideration of Appellees' pre-issuance chain of title challenges was erroneous.  Because the standing analysis properly begins with Technology Alternatives, and there is a clear chain of title from that entity to Mayfair, as explained below, the decision of the District Court should be reversed.

## II.   Even If It Were Permissible To Consider A Pre-Issuance Chain Of Title Challenge, The District Court Did Not Correctly Apply A Presumption That The Patentee Owned The Patent Upon Issuance.

Even if consideration of Appellee's pre-issuance chain of title arguments were appropriate, the District Court did not correctly apply a presumption that the assignee listed on the face of the patent was the legal title owner at issuance, by finding the presumption was defeated by a "lack of evidence."  A9.

The District Court noted that, as the party listed on the '441 Patent, Technology Alternatives presumptively held legal title.  A9.  Where courts have been required to determine the owner of a patent,[5] they have consistently

---

[5] The following cases have arisen in the context in which a court must decide the true owner of a patent, including:  (a) a case in which both plaintiff and defendant claim ownership of a patent (*Roche*); (b) a case arising under the specialized statutory framework applicable to applications to market generic drugs (*Astra Aktiebolag*); and (c) bankruptcy proceedings (*Chesapeake*).  These cases do not suggest that an accused infringer may challenge standing based upon alleged pre-issuance chain of title issues that would result in ownership interest held by third parties.  This makes sense, as "[i]t has long been settled" that a defendant may not

concluded that the patentee listed on the face of the patent is *presumed* to have been the rightful owner at issuance.  *See, e.g., Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 487 F. Supp. 2d 1099, 1111 n.4 (N.D. Cal. 2007); *Astra Aktiebolag v. Andrx Pharms., Inc.*, 222 F. Supp. 2d 423, 514 n.50 (S.D.N.Y. 2002); *Chesapeake Fiber Packaging Corp. v. Sebro Packaging Corp.*, 143 B.R. 360, 368 (D. Md. 1992); *cf. Bellehumeur v. Bonnett*, 127 F. App'x. 480, 484 (Fed. Cir. 2005) ("Because the '187 reissue patent, like the predecessor '161 patent, issued in the names of the three co-inventors *with no assignment listed on the face of the patent*, they are presumptively the owners of the '187 reissue patent.") (Emphasis added) (A642).  A presumption shifts the burden of production of evidence to the party against whom it is imposed:  "In a civil case, unless a federal statute or these rules provide otherwise, the party against whom a presumption is directed has the burden of producing evidence to rebut the presumption."  *See, e.g.,* Fed. R. Evid. 301; Black's Law Dictionary 995  (defining "rebuttable presumption" as "an inference drawn from certain facts that establish a prima facie case, which may be overcome by the introduction of contrary evidence").  A party against whom a presumption is applied cannot rely upon the *lack* of evidence to overcome the presumption.  *See, e.g.*, *Routen v. West*, 142 F.3d

_____

assert the equitable rights of a third party as a defense.  *Mercantile Nat'l Bank of Chicago*, 524 F.2d at 1034.

1434, 1440 (Fed. Cir. 1998) (explaining, a "presumption affords a party, for whose benefit the presumption runs, the luxury of not having to produce specific evidence to establish the point at issue").[6]

Here, if the Court does not find that Technology Alternatives was the "patentee" vested with legal title to the Patent by virtue of its being the organization to which the Patent issues, Technology Alternatives was *at the very least* presumed to be the rightful owner of the '441 Patent.  In applying any such presumption, Appellees would be required to come forward with evidence that affirmatively demonstrates that the Technology Alternatives was not the proper assignee at issuance.  Appellees did not point to any evidence to rebut the presumption, relying instead exclusively upon the *lack* of evidence to support the presumption.   The District Court erred by accepting Appellees' argument.  Specifically, the District Court ruled against Mayfair, finding that Defendants "have overcome the presumption by demonstrating *a lack of evidence* in support of Mayfair's contention that Technology Alternatives is a proper assignee."  A9.  This was legal error.

---

[6] Indeed, if a party could rely upon the lack of evidence to overcome a presumption, there would be little reason to impose a presumption.  The District Court does not explain what purpose the presumption plays if it can be overcome simply by pointing to a lack of evidence to support it.

**III.    The District Court Erred In Finding That The Existence Of A Bill Of Sale From A UCC Foreclosure Sale Was Required To Substantiate The Presumption That Technology Alternative Owned The '441 Patent.**

Appellees argued – and the District Court accepted – that the presumed chain of title to the '441 Patent application was fatally flawed because insufficient evidence existed that the patent application transferred from Gooitech to Hinsdale Bank during a foreclosure sale (and prior to Hinsdale Bank transferring the patent application to Technology Alternatives). A13-A14. The District Court recognized that the security agreement between Gooitech and Hinsdale Bank encompassed the '441 Patent application and was filed with the PTO. A13. The District Court also noted the existence of a sworn statement from Gooitech's CEO, which was also filed with the PTO, "confirming that Hinsdale took possession of Gooitech's rights pursuant to the security agreement." A13; *see also* A139 ("Hinsdale took possession of Gooitech's rights [to the 441 Patent application] through execution of a security interest in the same."). The District Court nonetheless found that it was left "to speculate that Hinsdale purchased the '441 [P]atent application at the sale," because a bill of sale (or some other document) has not yet been produced specifically delineating that the '441 Patent application was encompassed in the foreclosure sale. A13-A14.

Thus, the District Court ignored ample evidence that the '441 Patent application was transferred to Hinsdale from Gooitech (*e.g.*, the security agreement

and the sworn statement from Gooitech's CEO), and found a fatal break in the

chain of title warranting dismissal because Mayfair cannot – at the outset of

litigation and without discovery – produce a single, specific document listing the

patent in suit as being part of the UCC foreclosure sale.  A13-A15.[7]  This

conclusion eviscerates any presumption that Technology Alternatives, as the

patentee, owned the '441 Patent.

Even if no presumption applied that Technology Alternatives owned the

'441 Patent upon the Patent's issuance, the District Court's conclusion would still

be legally erroneous.  Courts have readily concluded that sworn testimony is

sufficient to substantiate the contents of title transfer documents that are not

available.  *See Hypoxico Inc. v. Colo. Altitude Training*, 630 F. Supp. 2d 319, 323-

24 (S.D.N.Y. 2009) (holding that record evidence was sufficient to conclude that

patents were transferred prior to suit being filed in spite of the fact that original

assignments had been lost); *Kono Mfg. Co. v. Vogue Optical Mfg. Co.*, 94 F. Supp.

251, 251-52 (S.D.N.Y. 1950) (holding that evidence including testimony about

---

[7] Aside from demanding too much at the outset of the litigation, the District Court does not cite any authority that would require the bill of sale (or any other document from the UCC foreclosure and sale) to specifically refer to the '441 Patent.  Moreover, any deficiency in the notice would affect *only* Hinsdale's ability to obtain a judgment for deficiency from Gooitech.  *See Gen. Motors Acceptance Corp. v. Stoval*, 872 N.E.2d 91, 101-02 (Ill. App. Ct. 2007) (noting the effect of failure to give proper notice is on ability to recover deficiency).

assignment was sufficient when the original document could not be found). Here, the sworn statement by the CEO of Gooitech that is part of the PTO's files clearly states that the rights to the '441 Patent was taken by Hinsdale as part of the foreclosure proceedings. A139. This evidence is sufficient as a matter of law to establish the transfer of ownership even in the absence of the bill of sale.[8]

## IV.    The District Court's Conclusion That The Patent Act Preempts State UCC Law Is Contrary To Federal Circuit Precedent.

The District Court erroneously concluded that title was not transferred from Technology Alternatives Inc. to Services by Designwise, finding that Illinois UCC law is preempted by the Patent Act. A20. While the District Court presumed that transfer of the patent from Technology Alternatives to Services by Designwise was appropriate under Illinois UCC law,[9] it nonetheless found that the Patent Act's written assignment requirement preempts UCC law, which requires that a party consent to the pledging of assets in a security agreement in order for the assets to

---

[8] Reaching any other conclusion would lead to absurd results. If, as the District Court appears to posit, the absence of a document defeats title, parties could lose title to a patent where documentation was lost or destroyed (*e.g.*, through a fire). Any rule of law that would lead to such results should be rejected. *Cf. Matter of Franklin*, 709 F. Supp. 109, 113 n.7 (E.D. Va. 1989) (explaining that Federal Rule of Evidence 1004 "allows the admission of other evidence of the contents of a writing where the original has been lost or destroyed," and compiling cases).

[9] Under Illinois UCC law, a party may pledge assets of another so long as it has the consent of that party. *See Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 436 (7th Cir. 1980). That is precisely what happened here; Technology Alternatives Inc. consented to have its asset – the '441 Patent – pledged to Services by Designwise. A20, A181-A182, A198, A203, A207.

21

be transferred:

> Even if the court were to assume that state law permits Technology
> Alternatives to consent to TechAlt's inclusion of the '441 patent as
> security, the Illinois UCC provisions are preempted by § 261 of the
> Patent Act because Technology Alternatives and TechAlt never
> executed a written assignment.

A20.

The District Court's conclusion is wrong as a matter of law. In *Sky Technologies LLC v. SAP AG*, the Federal Circuit specifically held that the Patent Act's requirement of a written assignment *does not preempt* state UCC law:

> Appellants claim if Massachusetts law is found to allow transfers of
> patent ownership without a writing, then federal preemption must
> occur pursuant to 35 U.S.C. § 261; however, Appellants are incorrect.
> Section 261 speaks only to assignments of patents; there exists no
> federal statute requiring a writing for all conveyances of patent
> ownership. Therefore, no federal law preempts the use of the
> Massachusetts UCC foreclosure provisions to transfer patent
> ownership by operation of law. Consequently, Appellants'
> preemption argument lacks merit.

576 F.3d at 1381; *see also Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1342 (Fed. Cir. 2010) ("Who has legal title to a patent is a question of state law") (citation omitted). In spite of the fact that the District Court refers to *Sky Technologies* in an earlier discussion, *see* A12, it fails even to mention that decision in concluding that Illinois's UCC law is preempted by the Patent Act. There is no way to reconcile the District Court's preemption conclusion with the Federal Circuit's controlling decision in *Sky Technologies*.

The District Court's reliance on *Abraxis Bioscience, Inc. v. Navinta LLC*, is misplaced.  625 F.3d 1359, 1366 (Fed. Cir. 2010).  That case did not involve a transfer as a matter of law.  That case merely stands for the unsurprising proposition that a corporate entity may not assign what it does not own.[10] Mayfair's contention is not that TechAlt (the corporate parent) conveyed title of the '441 Patent to Services by Designwise.  Rather, the '441 Patent transferred directly from Technology Alternatives Inc. to Services by Designwise through a UCC sale.[11]

In its opinion, the District Court presumed that, under state UCC law, Technology Alternatives could consent to TechAlt's inclusion of the '441 Patent as security.  A20.  Accordingly, the Federal Circuit's decision in *Sky Technologies*

---

[10] Even if *Abraxis* could be understood to contradict the holding in *Sky Technologies*, the Court is bound to follow the earlier ruling – *Sky Technologies*. *See Newell Cos., Inc. v. Kenney Mfg. Co.*, 864 F.2d 757, 765 (Fed. Cir.1988) (explaining that prior decisions of a panel are binding on later panels unless overturned *in banc*, and, where there is a conflict, "the precedential decision is the first").

[11] On November 19, 2004, Technology Alternatives Inc., TechAlt (Technology Alternatives Inc.'s corporate parent), and Services by Designwise entered into a series of agreements to settle litigation.  The primary agreement was a Settlement Agreement signed by all three parties that incorporated the terms of a number of "related agreements."  *See* A19-A20, A209-A210, A235 (¶ 21.7).  One of the related agreements was a Security Agreement on a debt owed to Services by Designwise by TechAlt.  A19-A20, A182.  That Security Agreement pledged the '441 Patent.  *Id.*  When TechAlt defaulted, Services by Designwise foreclosed on the '441 Patent (and other assets) and conducted a UCC sale.  A327-A328, A330-A332.

23

clearly means that legal title was transferred to Services by Designwise.

Presumably recognizing the error in Magistrate Fallon's decision in light of *Sky Technologies*, Appellees improperly raised a new argument for the first time in their response to Mayfair's objections to Magistrate Judge Fallon's Report and Recommendation: that Illinois UCC procedures were not properly followed in the transfer of the '441 Patent from Technology Alternatives to Services by Designwise. *See* A536-A538 (Appellant's Mot. to Strike) (noting that it is well settled that arguments not raised before a Magistrate Judge are waived and may not be raised in response to the Magistrate's Report and Recommendation, and compiling ample supporting authority). Specifically, Appellees argued that Technology Alternatives did not "consent" to the pledging of the '441 Patent. *See* A531-A532 (Appellees' Resp. to Appellant's Objs.). Even if properly raised, this argument fails for at least two reasons.

First, Technology Alternatives could never have challenged the foreclosure on the '441 Patent. Under Illinois law, a security agreement is valid and enforceable where "the debtor has rights in the collateral," a legal requirement under which a debtor may pledge the assets of another "if the true owner of the collateral has agreed to the debtor's use of the collateral as security or if the true owner has become estopped to deny the creation or existence of the security interest." *See Matter of Pubs., Inc. of Champaign*, 618 F.2d at 436. The true

owner is "estopped" where it knowingly allows the debtor to represent that it has

sufficient rights to pledge the asset:

> '[W]here the true owner of the property allows another to appear as
> the owner of or to have full power to dispose of the property, so a
> third party is led into dealing with the apparent owner,' the true owner
> will be estopped from asserting that the apparent owner did not have
> the title.

*Id.* at 439 (quoting *Nat'l Bond & Inv. Co. v. Shirra*, 255 Ill. App. 415, 419 (Ill.

App. Ct. 1930)).  Here, TechAlt had sufficient "rights in the" '441 Patent for the

security interest to be enforceable under this law.  As the Report recognizes,

Technology Alternatives executed documents by which TechAlt pledged the '441

Patent to Services by Designwise.    A19-A20.    These documents are sufficient

under Illinois UCC law to pledge the '441 Patent because they demonstrate that

Technology Alternatives *either* consented to have the '441 Patent pledged *or at the*

*very least* allowed TechAlt to represent that it had the legal right to pledge the '441

Patent.[12]  In either event, TechAlt had sufficient "rights in the collateral," meaning

---

[12] Defendants argument is that the wording of the relevant documents do not
represent a "consent" by Technology Alternatives to the pledging of the '441
Patent by TechAlt but instead represent that Technology Alternatives would
transfer the '441 Patent to TechAlt (but never did so).  *See* A531-A532 (Appellees'
Resp. to Appellant's Objs.).  This argument is wrong because the relevant inquiry
for "consent" is simply whether Technology Alternatives agreed that the '441
Patent could be pledged, and the documents demonstrate that Technology
Alternatives agreed to this.    But even if the Court were to accept Defendants
argument, the argument would simply lead to the "estoppel" portion of the *Matter
of Pubs.* decision. The only way to conclude that Technology Alternatives did not

the security agreement was valid and enforceable.

Second, even if Technology Alternatives could have challenged the transfer of the '441 Patent *at the time* of the UCC sale, it lost any rights to the Patent when it failed to object to its transfer pursuant to the sale.  The law is clear that a UCC sale results in the termination of the rights held by any party that was on notice of the sale and did not object.  *See, e.g., Korogluyan v. Chicago Title and Trust Co.*, 572 N.E.2d 1154, 1160 (Ill. App. Ct. 1991); *Bryant v. Am. Nat'l Bank and Trust Co. of Chicago*, 407 F. Supp. 360, 365 (N.D. Ill. 1976).  Technology Alternatives Inc. unquestionably was on notice of the UCC sale and did not object.  The same is true of Technology Alternatives' owners: Mr. Masanek and Mr. Solomon.  *See* Settlement Agreement (A243-A260).  As a result, any right that it had to object was extinguished and any right that it might have had in the '441 Patent was transferred as a matter of law to Services by Designwise.

---

properly consent is to conclude that Technology Alternatives allowed TechAlt to incorrectly assert that it owned (or would own) the '441 Patent.  But if Technology Alternatives allowed this representation, it was estopped from challenging the security interest.  Whether by consent or estoppel, the security agreement was valid and enforceable and the '441 Patent was transferred to Services by Designwise as a matter of law through the UCC foreclosure and sale.  A330-A332 (Secured Party Bill of Sale and Assignment) (reciting that all intellectual property secured by the security interest, including the '441 Patent explicitly, was sold to Services by Designwise).

**V.    The District Court Incorrectly Concludes That Mayfair Was Not A *Bona Fide* Purchaser For Value.**

If this Court finds that the Patent Act does in fact preempt state UCC law, then the District Court's decision should be reversed because the court inappropriately concluded that Mayfair's predecessor (CRG) did not qualify as a *bona fide* purchaser.  First, the Court incorrectly concludes that "Mayfair is not a *bona fide* purchaser because Mayfair did not take its title from an entity that held legal title to the '441 Patent."  A23.  The Federal Circuit's decision in *Filmtec Corp.*, makes clear that the *bona fide* purchaser rule extinguishes issues of both legal and equitable title and that a party can qualify as a *bona fide* purchaser even if the party from whom it acquired the patent did not hold legal title.  939 F.2d at 1573.  In that case, the Federal Circuit noted that the defendant asserted that the inventor had entered into an employment agreement assigning all future inventions to his employer (and that the employer in turn had a similar agreement with the government).  *Id.* at 1571.  The Court concluded that if the inventor had entered into such an agreement, it resulted in the immediate transfer of legal title once the invention was conceived, so the inventor would not have had legal title when he subsequently transferred the patent application to Filmtec.  *Id.* at 1572.  The Court nevertheless noted that the *bona fide* purchaser rule could be applied to invalidate the initial assignment in the employment agreement if the requirements of that rule were otherwise met.  *Id.* at 1573-74.

27

Second, the District Court incorrectly concluded that Mayfair's predecessor (CRG) was on constructive notice of defects in the chain of title barring application of the *bona fide* purchaser rule. The Court's only basis for this conclusion is the fact that only two assignments from the six inventors were *recorded* with the PTO. A24. The Court does not explain how the fact that certain assignments were not recorded put CRG on notice that the patent had not actually been assigned. An assignment is valid even if it is not recorded with the PTO. *See Mabbett*, 847 F.2d 841 at at *2 n.2 ("Legal title to a patent may pass despite a failure to record") (A654); *Cf. SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1327-28 (Fed. Cir. 2010) ("The recording of an assignment with the PTO is not a determination as to the validity of the assignment"). Accordingly, the fact that only two of the six inventors recorded assignments could not place CRG on notice of defects in the chain of title. Moreover, there was ample *other* evidence that clearly supported the chain of title. Most notably, the PTO itself concluded that Technology Alternatives was the legal title holder at the time the patent issued (as evidenced by the fact that the PTO issued the patent to the company). The District Court does not explain why CRG was not allowed to rely upon the PTO's determination that Technology Alternatives was the legal title holder at issuance.[13]    *See, e.g.*,

---

[13] The District Court's reliance on *Bd. of Tr. of Leland Stanford Junior Univ.*, is misplaced, as that case involved an assignment by the plaintiff's own employee to

*Arachnid, Inc.*, 939 F.2d at 1578 n.2 ("The entity to whom the grant of a patent is made by the PTO [or that entity's successor in title] holds the 'legal title' to the patent.") (alteration in original) (citations omitted).    Thus, the Court's determination that CRG was not protected by the *bona fide* purchaser rule was erroneous.

## CONCLUSION

For the foregoing reasons, the District Court's decision adopting Magistrate Judge Fallon's Report & Recommendation and dismissing Mayfair's complaint should be reversed and this case should be remanded for further proceedings.

Dated September 2, 2014.

Respectfully submitted,

/s/ Daniel Kotchen
Daniel Kotchen
Michael von Klemperer
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC  20009
Telephone:  (202) 471-1995
Facsimile:  (202) 280-1128
dkotchen@kotchen.com
mvk@kotchen.com

---

a third-party.    583 F.3d at 843; A24.    This Court rejected plaintiff's *bona fide* purchaser argument after finding that "[a]n organization can be charged with notice of its employees' assignments."    *Id.*    No comparable relationship existed here between CRG and the prior title holders, making a finding of constructive knowledge inappropriate.

*Attorneys for Plaintiff-Appellant Mayfair
Wireless, LLC*

# ADDENDUM I

## THE DECISION OF THE COURT BELOW

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MAYFAIR WIRELESS LLC,                        )
                                             )
         Plaintiff,                          )
                                             )
    v.                                       )    Civil Action No. 11-772 (GMS-SRF)
CELICO PARTNERSHIP d/b/a VERIZON             )
WIRELESS, AT&T MOBILITY LLC,                 )
T-MOBILE USA INC. and                        )
SPRINT NEXTEL CORPORATION,                   )
                                             )
         Counterclaim-Defendants.            )
                                             )

## ORDER ADOPTING MAGISTRATE JUDGE'S RECOMMENDATION

This Order is issued upon consideration of the Report and Recommendation of United

States Magistrate Judge Sherry Fallon issued on August 30, 2013, and the Plaintiff's objections

(D.I. 41) thereto.

For the reasons set forth in Judge Fallon's Report and Recommendation,

IT IS HEREBY ORDERED THAT:

1.     Magistrate Judge Fallon's Report and Recommendation (D.I. 40) is ADOPTED;

2.     Defendants' Motion to Dismiss for Lack of Subject Jurisdiction (D.I. 17) is

GRANTED; and

3.     Plaintiff's Motion for Leave to File a Sur-Reply (D.I. 30) is DENIED.

Dated: June 3, 2014

_____
CHIEF/UNITED STATES DISTRICT JUDGE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| MAYFAIR WIRELESS LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 11-772-SLR-SRF |
| | ) |
| CELICO PARTNERSHIP d/b/a VERIZON | ) |
| WIRELESS, AT&T MOBILITY LLC, | ) |
| T-MOBILE USA INC. and | ) |
| SPRINT NEXTEL CORPORATION, | ) |
| | ) |
| Defendants. | ) |

## REPORT AND RECOMMENDATION

### I. INTRODUCTION

Presently before the court in this patent infringement action are the following motions: (1)

a motion to dismiss the amended complaint for lack of subject matter jurisdiction, filed by

defendants Cellco Partnership (d/b/a Verizon Wireless) ("Cellco"), AT&T Mobility LLC

("AT&T"), T-Mobile USA, Inc. ("T-Mobile"), and Sprint Nextel Corporation ("Sprint")

(collectively, "Defendants") on November 14, 2011 (D.I. 17); and (2) plaintiff Mayfair Wireless,

LLC's ("Mayfair" or "Plaintiff") motion for leave to file a sur-reply in opposition to Defendants'

motion to dismiss (D.I. 30). For the following reasons, I recommend that Defendants' motion be

granted, and that Mayfair's motion be denied as moot.[1]

---

[1] Defendants requested that the court consider all of the briefs submitted with regard to the
Motion to Dismiss, including the respective sur-reply briefs submitted by the parties. All briefs
have been considered by the court for purposes of this Report and Recommendation.

## II.    BACKGROUND

United States Patent No. 6,587,441 ("the '441 patent"), which was published by the

United States Patent and Trademark Office (the "PTO") on July 3, 2003, is directed to a method

and apparatus for data transfer over various wireless networks. ('441 patent, Abstract) The '441

patent claims priority to a provisional application filed on January 2, 1999, which named six

inventors: Jeffrey Urban, Jeffrey Barhorst, Christopher C. Solomon, Herbert Edwards, Chris

Oltrogge, and Adam Albert (collectively, the "Named Inventors"). ('441 patent) The '441 patent

identifies Technology Alternatives, Inc. ("Technology Alternatives") as the assignee. (*Id.*) The

Named Inventors allegedly assigned the '441 patent application to their employer, Gooitech, Inc.

("Gooitech").[2] (D.I. 19, Exs. D & E) James Solomon acted as CEO of Gooitech. (*Id.*, Ex. G)

Before the application for the '441 patent was filed, Hinsdale Bank & Trust Company

("Hinsdale") extended financing to Gooitech and took a security interest in Gooitech's assets

pursuant to a security agreement dated May 20, 1998. (D.I. 19, Ex. N) The security agreement,

which purportedly covered all existing and after-acquired assets, includes as collateral "general

intangibles" that may be "hereafter acquired," but does not specifically refer to the application for

the '441 patent, which had not yet been filed. (*Id.*) Gooitech subsequently defaulted on its loan,

and the company dissolved.[3] (*Id.*, Exs. G, O, P) Hinsdale foreclosed on Gooitech's assets,

including the application for the '441 patent. (*Id.*, Ex. G) Hinsdale then purchased Gooitech's

---

[2]Although each of the Named Inventors consistently maintains that they assigned their rights in the '441 patent application to Gooitech, documentation of these assignments is limited to the unconditional written assignments made by Jeffrey Urban and Christopher Solomon to Gooitech in 2001 and 2005, respectively. (D.I. 19, Exs. D & E)

[3]The exact date of Gooitech's dissolution is uncertain due to inconsistencies in the

2

assets at an Illinois UCC sale. (D.I. 28, Ex. 1) The August 30, 2000 bill of sale was not recorded

with the PTO and was not produced as an exhibit to the briefing of this motion. (D.I. 19, Ex. C)

Pursuant to a March 31, 2001 bill of sale, Hinsdale sold its rights to the '441 patent

application to Sierra Strategic Consulting, Inc. ("Sierra"). (D.I. 19, Ex. Q) The March 31, 2001

bill of sale does not reference the application for the '441 patent specifically, but refers generally

to the intellectual property rights that Hinsdale acquired from Gooitech pursuant to the missing

August 30, 2000 bill of sale. (*Id.*) On August 10, 2001, Sierra assigned its rights to the

application for the '441 patent to 3P Networks, Inc. ("3P Networks"), which was owned and run

by James Solomon. (*Id.*, Ex. R)

On April 2, 2003, 3P Networks allegedly transferred its rights, title, and interest in the

'441 patent application to Technology Alternatives, Inc. ("Technology Alternatives"), which was

owned by James Solomon and Paul Masanek ("Masanek"). (*Id.*, Ex. S) James Solomon filed a

document entitled "Notice of Assignment and Assumption of Right" (the "Notice of

Assignment") with the PTO, which acknowledged the transfer from 3P Networks to Technology

Alternatives. (*Id.*) The underlying assignment was not filed with the PTO.

The PTO issued the '441 patent on July 1, 2003 to Technology Alternatives as the

assignee. ('441 patent) After the '441 patent issued, Technology Alternatives entered into a

business relationship with Services by Designwise, Ltd. ("SBD") and TechAlt, Inc. ("TechAlt").

A dispute arose between the entities, and SBD and Masanek sued Technology Alternatives,

TechAlt, and James Solomon. The parties entered into a settlement agreement on November 19,

---

records of the Illinois Secretary of State.

3

2004, pursuant to which Technology Alternatives became a wholly owned subsidiary of TechAlt.
(D.I. 19, Ex. V at § 21.7)

On the same date, TechAlt and SBD entered into a security agreement, in which TechAlt

granted SBD a security interest in all of TechAlt's assets, including its purported interest in the

'441 patent. (D.I. 19, Ex. T) SBD prepared a UCC financing statement documenting the

security interest and filed it with the PTO. (*Id.*, Ex. U)

TechAlt subsequently defaulted on its obligations under the security agreement, and SBD

filed an action for replevin to foreclose on the collateral. On September 29, 2005, the parties

executed a settlement agreement in which TechAlt and James Solomon allowed SBD to take

immediate possession of the collateral described in the November 19, 2004 security agreement.

(*Id.*, Ex. W) The Circuit Court for Cook County, Illinois entered an order of replevin and

allowed SBD to take possession of the collateral. SBD conducted a UCC sale and purchased

TechAlt's assets at the sale. (*Id.*, Ex. CC)

SBD then assigned its purported rights in the '441 patent to Commonwealth Research

Group LLC ("CRG") on July 7, 2009. (*Id.*, Ex. DD) Pursuant to the assignment agreement,

CRG offered to pay SBD $150,000 in exchange for the '441 patent, and promised to pay SBD

40% of any licensing or enforcement revenues from the '441 patent. (*Id.*, Ex. DD at § 2.2)

The agreement granted CRG a 60-day window to cancel the agreement, which expired

without cancellation. (*Id.*, Ex. DD at §§ 1.2, 1.3) On November 16, 2010, CRG purported to

assign its rights in the '441 patent to Mayfair, effective as of October 20, 2010. (*Id.*, Ex. EE)

The agreement was executed by the same person on behalf of both CRG and Mayfair, and

Mayfair agreed to be bound by all of CRG's obligations to SBD. (*Id.*)

4

Mayfair entered into agreements with the six Named Inventors in the summer of 2011 regarding their assignment of rights in the '441 patent to Mayfair, to the extent that those rights were not previously assigned. (*Id.*, Exs. H-M) In August 2011, Mayfair also entered into an agreement with Masanek and James Solomon, in which Masanek and James Solomon purported to assign to Mayfair any rights they had acquired in the '441 patent in their capacities as prior owner of SBD, Technology Alternatives, and TechAlt, and prior owner of Gooitech, Sierra, 3P Networks, Technology Alternatives, and TechAlt, respectively. (*Id.*, Exs. FF & GG) Mayfair initiated the present action on September 1, 2011. (D.I. 1)

## III. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring its claim. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the court's subject matter jurisdiction. In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the court must accept all factual allegations in the complaint as true, and the court may only consider the complaint and documents referenced in or attached to the complaint. *See Gould Elec., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000). In reviewing a factual challenge to the court's subject matter jurisdiction, the court is not confined to the allegations in the complaint. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). Instead, the court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997). Once the court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that

5

jurisdiction exists. *See Mortensen*, 549 F.2d at 891.

## IV. DISCUSSION

### A. Consideration of Pre-Issuance Gaps in the Chain of Title

In support of their motion to dismiss, Defendants allege three breaks in the chain of title of the '441 patent. Before reaching the parties' contentions regarding each individual break in the chain of title, the court will consider Mayfair's contentions that any alleged breaks in the chain of title occurring prior to the issuance of the '441 patent are irrelevant.

According to Mayfair, the statute conferring the right to sue focuses on the patentee. The patentee in this case is Technology Alternatives. Mayfair argues that nothing in the statutory framework allows a challenge to standing based upon alleged deficiencies in the chain of title prior to the patent's issuance to the patentee. (D.I. 28 at 6-7) Mayfair contends that every transfer of ownership interest before the '441 patent's issuance to Technology Alternatives involved an exchange of equitable title, which is irrelevant to a determination of whether breaks in the legal chain of title occurred. (*Id.* at 7) Mayfair further alleges that Technology Alternatives, as the named assignee, was the presumptive owner at the time of the '441 patent's issuance due to the deference given to the PTO's determination of a proper assignment, and Defendants have failed to overcome the presumption. (*Id.* at 9-10)

In response, Defendants contend that the entire chain of title, including the pre-issuance chain of title, must be considered because inventorship provides the starting point for determining the ownership of patent rights. (D.I. 29 at 2-3) Defendants acknowledge that courts are split regarding whether an assignee listed on the face of a patent is presumptively the owner of the patent, but they contend that the court need not resolve the split because the undisputed

6

evidence of two pre-issuance breaks in the chain of title rebuts any such presumption. (*Id.* at 3-4)

A patent may issue to either the inventor or an assignee of the patent application. 35 U.S.C. §§ 151, 152. The person or entity to whom the patent is issued is known as the "patentee," and the patentee holds legal title to the patent. 35 U.S.C. § 100(d); *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1578 n.2 (Fed. Cir. 1991) (internal citations omitted). "Patent rights presumptively vest in the named inventors on the patent," or if an assignment has been made, in the named assignee, and the defendant bears the burden of overcoming the presumption to defeat the plaintiff's standing. *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 487 F. Supp. 2d 1099, 1111 n.4 (N.D. Cal. 2007).

"[I]t is settled law that between the time of an invention and the issuance of a patent, rights in an invention may be assigned and legal title to the ensuing patent will pass to the assignee upon grant of the patent." *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991). If an assignment expressly grants the inventor's rights in any future invention to an assignee, no further act is required once the invention comes into being, and the transfer of legal title to the assignee occurs by operation of law. *Id.* at 1573. An assignment of rights in an invention made prior to the existence of the invention is an assignment of an expectant interest, and the assignee holds equitable title. *Id.* at 1572.

The Manual of Patent Examination Procedure ("MPEP") provides that a patent may issue directly to an assignee if a request for issuance of the application in the name of the assignee is filed with the PTO, indicating that a proper assignment has been recorded with the PTO. MPEP § 307 (citing 37 C.F.R. § 3.81(a)). Although the recording of an assignment with the PTO is not a determination of the validity of the assignment, it creates a presumption of validity. *See* 37

7

C.F.R. § 3.54; *SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1327-28 (Fed. Cir. 2010) ("[W]e think that [recording an assignment] creates a presumption of validity as to the assignment and places the burden to rebut such a showing on one challenging the assignment."). This presumption is particularly strong when an assignee seeks to assume responsibility for the prosecution of a patent application before the patent is issued, because the assignee must first establish its ownership rights by providing documentary evidence of the chain of title to the satisfaction of the director of the PTO. 37 C.F.R. § 3.73(b); MPEP § 324.

In the present matter, the patent issued to Technology Alternatives as patentee, giving rise to a presumption that Technology Alternatives properly held legal title at the time the patent issued. To rebut the presumption, Defendants ask the court to examine whether any evidence exists that Technology Associates held legal title to the patent at the time of its issuance. However, no writings exist documenting an assignment to Technology Alternatives. Mayfair contends that deference to the PTO should dispel any challenge to the presumption. However, it would be an exercise in speculation to assume how Technology Alternatives satisfied the PTO of its "ownership interest" without probing the pre-issuance transactions.

Defendants have overcome the presumption by demonstrating a lack of evidence in support of Mayfair's contention that Technology Alternatives is a proper assignee. Specifically, four of the six Named Inventors did not have written assignments on file with the PTO indicating their intention to transfer their ownership interests, in contravention of 35 U.S.C. § 261 and 37 C.F.R. § 3.81(a). The request for issuance of the patent to Technology Alternatives is likewise missing from the PTO's records. Although Mayfair complains that Defendants have produced no documentary evidence to rebut the presumption, the court finds that Defendants have sufficiently

8

argued that the requisite documents do not exist, and Mayfair fails to demonstrate otherwise by producing the required documents demonstrating that the chain of title is intact.

Mayfair relies on *Kahn v. General Motors Corp.* in support of its position that the pre-issuance chain of title is irrelevant to the standing inquiry. However, the district court in *Kahn* acknowledged that the alleged patent owner must be able to establish its ownership rights before it will have the right to sue. 1995 WL 2135, at *1 (S.D.N.Y. Jan. 3, 1993). Although the issuance of the patent-in-suit in the inventor's name was prima facie evidence of the inventor's legal title, the court considered evidence presented by the defendant casting doubt on the inventor's title. *Id.* The court's decision in *Kahn* is distinguishable from the present matter because the court concluded that "it would be unjust to rob the undisputed inventor of the fruits of his prima facie valid patent because a dissolved non-party . . . once had equitable rights in future CIP applications" that the inventor did not file until after the grandparent application had been reassigned to him. *Id.* at *5. In contrast, the instant case does not involve a proper reassignment of the patent-in-suit to the original inventor. For these reasons, the court will assess each alleged break in the chain of title, including those occurring prior to the issuance of the '441 patent.

### B.     Analysis of Three Alleged Gaps in Chain of Title

In support of their motion to dismiss, Defendants contend that three breaks in the chain of title to the '441 patent demonstrate Mayfair's lack of ownership interest in the '441 patent and resulting lack of standing to bring the present action. As the party seeking to invoke the court's subject matter jurisdiction, Mayfair bears the burden of proving that it has standing to sue for infringement. *See Whitmore v. Arkansas*, 495 U.S. 149, 154 (1990); *Sicom Sys., Ltd. v. Agilent*

*Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005).

## 1. Bill of sale between Gooitech and Hinsdale

Defendants first contend that the missing August 30, 2000 bill of sale between Gooitech

and Hinsdale constitutes a break in the chain of title. (D.I. 18 at 13) According to Defendants,

the security agreement entered into by Gooitech and Hinsdale establishes only a lien against

"general intangibles" that were owned by Gooitech, without specifically referencing the '441

patent or any intellectual property rights, and the August 30, 2000 bill of sale was not recorded

with the PTO. (*Id.*) As a result, Defendants contend that it is impossible to determine whether

the missing bill of sale from August 30, 2000 transferred any rights to the '441 patent to

Hinsdale. (*Id.* at 14) Defendants further contend that the March 31, 2001 bill of sale from

Hinsdale to Sierra, which references the August 30, 2000 bill of sale, does not identify the

assignment of rights to the '441 patent specifically. (*Id.* at 14) Defendants allege that the

unsigned letter produced by Mayfair announcing the sale, with no description of the collateral, is

insufficient to establish the transfer of ownership rights in the '441 patent to Hinsdale. (D.I. 29

at 6-7)

Citing Federal Circuit precedent, Mayfair responds that title to a patent may be

transferred without an assignment as a matter of law when a creditor forecloses upon assets

pledged by a debtor. (D.I. 28 at 13) According to Mayfair, the evidence establishes that

Hinsdale foreclosed on Gooitech's assets pursuant to the terms of the security agreement. (*Id.* at

14) Because the transfer did not require a writing in the first instance, Mayfair contends that it is

not required to produce a writing to substantiate the transfer. (*Id.*) Even if the writing

requirement were to apply, Mayfair contends that there would be no need to produce the bill of

10

sale because other record evidence is sufficient to establish the bill of sale's existence for purposes of the standing inquiry. (*Id.* at 15) Mayfair requests further discovery, including permission to obtain documents from third parties by subpoena, to fully resolve these issues. (D.I. 28 at 15-16)

As a preliminary matter, Federal Circuit precedent does not support Defendants' contention that patent rights may only be transferred by an assignment in writing.[4] Although federal law applies in determining the validity and terms of an assignment, state law controls any transfer of patent ownership by operation of law not deemed an assignment. *See Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009) (citing *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008)); *Jim Arnold Corp. v. Hydrotech Sys., Inc.*, 109 F.3d 1567, 1572 (Fed. Cir. 1997) ("[T]he question of who owns the patent rights and on what terms typically is a question exclusively for state courts."). A party that has been granted all substantial rights under the patent, "regardless of how the parties characterize the transaction that conveyed those rights," is considered to have legal title, and therefore standing. *Speedplay, Inc. v. Bebop, Inc.*,

---

[4] Defendants' reference to the Supreme Court's 1850 decision in *Gayler v. Wilder*, 51 U.S. 477 (1850), is inapposite. Defendants cite *Gayler* for the general proposition that "no rights can be acquired in [the patent] unless authorized by statute, and in the manner the statute prescribes." *Gayler*, 51 U.S. at 494. The Supreme Court addressed the distinction between an assignment of an undivided interest in a patent, which confers standing to sue for infringement, and a license, which does not confer standing to sue for infringement. *Id.* at 495. The Supreme Court did not address a situation involving a foreclosure on a security interest. The Federal Circuit has since observed that "there exists no federal statute requiring a writing for all conveyances of patent ownership." *Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1381 (Fed. Cir. 2009). Moreover, Defendants' citation to the Supreme Court's 1881 decision in *Ager v. Murray*, 105 U.S. 126, 131-32 (1881), is unpersuasive in light of the Federal Circuit's decision in *Sky Technologies*, which noted that the *Ager* decision "was based on the idea that a creditor cannot reach incorporeal property, such as a patent, due to its intangible nature." *Sky Techs.*, 576 F.3d at 1379. In distinguishing *Ager*, the Federal Circuit held that "transfer of patent ownership by operation

11

211 F.3d 1245, 1249-50 (Fed. Cir. 2000). Thus, it is the "substance of what was granted" that determines the rights in the patent, and not the form.[5] *Id.* at 1250.

The evidence in the instant case is insufficient to support Mayfair's contention that Hinsdale properly foreclosed on its interest in Gooitech's property pursuant to the terms of its security agreement. The security agreement granted Hinsdale an interest in all of Gooitech's existing and after-acquired tangible and intangible assets, which encompasses the application that led to the '441 patent. (D.I. 19, Ex. N)  The security agreement was subsequently recorded with the PTO. James Solomon, the CEO of Gooitech, filed a statement under 37 C.F.R. § 3.73(b) on August 23, 2001, confirming that Hinsdale took possession of Gooitech's rights pursuant to the security agreement. (D.I. 19, Ex. G)

However, the unsigned notice of public sale issued by Hinsdale on August 9, 2000 fails to list the collateral to be sold, leaving the court to assume that the application leading to the '441 patent was included in the foreclosure sale. (D.I. 28, Ex. 1)  Although the August 30, 2000 bill of sale might offer more clarity as to whether the '441 patent application was part of the collateral sold during the foreclosure sale, it is missing, leaving the court to speculate that Hinsdale purchased the '441 patent application at the sale.[6]  The subsequent March 31, 2001 bill

---

of law is permissible without a writing." *Id.* at 1380.

[5] Defendants do not contend that Hinsdale failed to comply with the state UCC foreclosure requirements, nor do Defendants contend that a transfer of patent rights by means other than assignment must be made in writing.

[6] This determination is not inconsistent with the court's previous determination that a written assignment is not required to transfer patent rights as a matter of law. In the present case, the record contains a number of writings regarding the transfer of collateral from Gooitech to Hinsdale. In reviewing these writings, the court finds that they do not shed any light on whether the application for the '441 patent was transferred.

of sale between Hinsdale and Sierra describes the property acquired by Hinsdale at the
foreclosure sale to generically include "trademarks, patents, [and] patent filings," but does not
specify that the '441 patent application was among those intellectual property rights. (D.I. 19,
Ex. Q) None of the above-listed evidence identifies the '441 patent application specifically, and
as a result, the court declines to assume that the rights to the application for the '441 patent were
included in the foreclosure sale.

Mayfair attempts to draw a comparison between the present matter and the Federal
Circuit's decision in *Sky Technologies*. In *Sky Technologies*, the Federal Circuit addressed the
transfer of title to patent rights pursuant to the terms of a security agreement between Ozro, a
corporation with a patent portfolio, and XACP, a venture capital firm. *Sky Techs.*, 576 F.3d at
1376-77. The security agreement granted XACP the right to foreclose on the collateral in the
event of a default by Ozro. *Id.* Ozro defaulted, and XACP issued a foreclosure notice
identifying the patents-in-suit as those to be sold at a public auction. *Id.* at 1377. XACP then
credit bid at the auction to buy the patents. *Id.* at 1378. The Federal Circuit concluded that
XACP properly complied with the Massachusetts UCC foreclosure requirements by placing the
patent collateral up for sale at a public auction and notifying Ozro of the sale. *Id.* at 1380-81.
When XACP later assigned the patents-in-suit to Sky Technologies, the Federal Circuit
concluded that Sky Technologies became vested with all rights, title and interest in the patents
because the chain of title had not been broken. *Id.* at 1381.

*Sky Technologies* is distinguishable from the facts of the present matter. First, in *Sky
Technologies*, the notice of sale specifically listed the patents-in-suit as those that were for sale.
*Id.* at 1380. In contrast, the notice of sale in the instant action does not list the collateral at all.

13

Instead, the notice of sale says, "The Collateral to be sold is described as follows:" with no subsequent description. (D.I. 28, Ex. 1) Second, the Federal Circuit in *Sky Technologies* based its ruling on the fact that all of the requirements of the Massachusetts UCC had been met. *Sky Techs.*, 576 F.3d at 1380. In the present matter, there is no evidence that the sale complied with the Illinois UCC.

For these reasons, I recommend that the court find a break in the chain of title between Gooitech and Hinsdale. However, even if it is assumed that legal title to the '441 patent application passed from Gooitech to Hinsdale by virtue of the Illinois UCC sale, the court is asked to address two other potential breaks in the chain of title.

### 2. Notice of assignment from 3P Networks

Defendants contend that a second break in the chain of title occurred between 3P Networks and Technology Alternatives because no written assignment regarding the transfer is on file with the PTO, and the notice of assignment between them is not an acceptable substitute for a written assignment. (D.I. 18 at 14) According to Defendants, the notice of assignment suggests that ownership of the '441 patent was transferred to Technology Alternatives in the past, but it conveys no rights standing alone. (*Id.*) Defendants note that oral assignments are insufficient to transfer patent rights under 35 U.S.C. § 261, and observe that the case law cited by Mayfair in support of its position does not involve an oral assignment. (D.I. 29 at 7)

In response, Mayfair contends that the notice of assignment was sufficient to transfer title to the patent because a valid assignment requires only a writing that unmistakably demonstrates the parties' intent to transfer title to the patent. (D.I. 28 at 16) Mayfair alleges that the PTO would not allow Technology Alternatives to prosecute the application and would not issue the

14

patent to Technology Alternatives without first determining that the documents on file with the PTO were sufficient to demonstrate a proper assignment to Technology Alternatives. (*Id.* at 16-17) According to Mayfair, even assuming that the prior transfer from 3P Networks to Technology Alternatives was an oral transfer, the notice of assignment is a writing that expresses the parties' unmistakable intent to transfer title to the patent application. (*Id.* at 18)

To the extent that an oral assignment of the rights to the '441 patent was made, the assignment between 3P Networks and Technology Alternatives fails because only written patent assignments which are recorded with the PTO are valid. 35 U.S.C. § 261. However, the notice of assignment between 3P Networks and Technology Alternatives sufficiently sets forth an intent to transfer ownership rights in the '441 patent to qualify as an assignment for purposes of 35 U.S.C. § 261. Although the notice of assignment is not identified as an "assignment," courts have held that the inquiry turns on the intent to transfer ownership rights in the patent, and not the title of the document. *See McClaskey v. Harbison-Walker Refractories Co.*, 138 F.2d 493, 499 (3d Cir. 1943) (holding that a bill of sale executed by the sheriff constituted an assignment because it sufficiently showed "an unmistakable intention to convey to the plaintiff everything which the sheriff had to sell."); *Valmet Paper Machinery, Inc. v. Beloit Corp.*, 868 F. Supp. 1085, 1087 (W.D. Wis. 1994) (concluding that written agreement demonstrated parties' intention to transfer all rights to the patent-in-suit, "[e]ven though it purports merely to confirm the ineffective prior oral agreement."). In the present matter, the notice of assignment lists the patent application for the '441 patent and specifically states that,

> [O]wnership in the same was transferred to Technology Alternatives, Inc. . . . This includes the entire right, title and interest in the Pending Patent Application and in and to all Letters Patent, of the United States and foreign countries, including any

15

divisionals, continuations, reissues and extensions thereof, that may be obtained
therefor.

(D.I. 19, Ex. S)  In keeping with the *McClaskey* court's decision, the notice of assignment in the

present matter sufficiently reflects 3P Networks' intent to assign ownership of the application for

the '441 patent to Technology Alternatives. *McClaskey*, 138 F.2d at 500 ("We think that to

effect the assignment of a patent it is not necessary to observe a precise formula so long as what

is done meets the substance of the requirements of the federal statute.").

   The facts of the present case are distinguishable from the facts set forth in the cases cited

by Defendants.  Specifically, in *Wheat v. Morrell*, the patent issued prior to the purported

assignment, and recording the purported assignment with the PTO did not result in a

determination by the PTO of the validity of the assignment or the effect it might have on the title

to a patent application. *Wheat v. Morrell*, 2010 WL 3522803, at *6 (W.D. Mo. Sept. 2, 2010); 37

C.F.R. §§ 3.54, 3.73(b).  When the situation before the court does not involve an assignee who

will take over the prosecution of a patent application, but instead involves the assignment of an

issued patent to an assignee as in *Wheat*, "[t]he recording of a document . . . is not a

determination by the [PTO] of the validity of the document or the effect that document has on the

title to an application, a patent, or a registration." 37 C.F.R. § 3.54.

   Defendants also cite *Sentinel Products Corp. v. Mobile Chemical Co.*, in which the

District of Massachusetts concluded that a bill of sale could not be read as an assignment of all

rights in the patent because the bill of sale did not include the patent in the list of property to be

transferred, "nor anything even resembling the patents." 2001 WL 92272, at *7 (D. Mass. Jan.

17, 2001).  The court finds that *Sentinel Products* is distinguishable because the notice of

16

assignment in the present matter expressly lists the patent-in-suit, indicating the intent to transfer ownership rights in the patent.

In their reply brief, Defendants emphasize the use of the past tense in the notice of assignment as an indication that no transfer of patent rights was intended by that document. (D.I. 29 at 7-8) Defendants' position is inconsistent with the Western District of Wisconsin's decision in *Valmet Paper*, in which the court expressly indicated that the agreement satisfied the requirements for an assignment by purporting to "confirm the ineffective prior oral agreement." *Valmet Paper*, 868 F. Supp. at 1087.

Therefore, assuming that the first break in the chain of title had not occurred, I recommend that the court find legal title effectively transferred to Technology Alternatives through the Notice of Assignment recorded by 3P Networks.

### 3. Assignment from Technology Alternatives to TechAlt

Defendants contend that the absence of an assignment from Technology Alternatives to TechAlt creates a third break in the chain of title, citing Federal Circuit precedent for the proposition that a written assignment is necessary to transfer legal title even between a parent and its subsidiary. (D.I. 18 at 15-16) According to Defendants, any indirect conveyance of the '441 patent to SBD that occurred under Illinois law is inconsistent with, and is preempted by, the Patent Act. (D.I. 29 at 9) Moreover, Defendants contend that no provision of the underlying security agreement indicates that shares of TechAlt were posted as collateral, and Mayfair's presumption that SBD acquired all of TechAlt's assets is insufficient in light of unrefuted evidence that another entity claims to have acquired TechAlt's assets. (*Id.* at 10)

In response, Mayfair alleges that SBD took title to the '441 patent directly from

17

Technology Alternatives as a matter of law under the UCC provisions by way of a security

agreement executed by TechAlt on November 19, 2004 and a settlement agreement executed by

Technology Alternatives on the same date. (D.I. 28 at 18)  Mayfair contends that TechAlt

specifically pledged the '441 patent as part of the security agreement, and this pledge was proper

despite the fact that TechAlt did not hold title to the '441 patent because Technology Alternatives

consented to TechAlt's pledge in the settlement agreement entered into by the parties on the

same date.  (*Id.*)  Mayfair further argues that, even if TechAlt did not have the right to pledge the

'441 patent, the UCC sale resulted in an indirect transfer of the '441 patent to SBD, curing any

defect.  (*Id.* at 20)  Mayfair alleges that SBD became the sole owner of Technology Alternatives,

and Technology Alternatives' rights in the '441 patent, as a result of the UCC sale.  (*Id.*)

The parties agree that Technology Alternatives did not assign its ownership interest in the

'441 patent to TechAlt in writing, and that TechAlt did not have legal title to the '441 patent.

Instead, the issues before the court are whether Technology Alternatives consented to TechAlt's

pledge of the '441 patent to SBD as collateral in the November 19, 2004 security agreement,

whether such consent is valid, and whether an indirect transfer of the '441 patent to SBD would

cure any defect.

Illinois law provides that a debtor may have sufficient rights to pledge collateral

belonging to another "if the true owner of the collateral has agreed to the debtor's use of the

collateral as security."  *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432, 436 (7th Cir. 1980).

Mayfair contends that Technology Alternatives consented to TechAlt's pledge of the '441 patent

by executing the November 19, 2004 settlement agreement, which incorporated by its terms

"[a]ll the terms and conditions of the Related Agreements," including the November 19, 2004

18

security agreement between TechAlt and SBD. (D.I. 19, Ex. V at ¶¶ 1.b, 21.7) In the security agreement, TechAlt pledged collateral, defined as "[a]ll of [TechAlt's] . . . patents, licenses, including patent licenses, including the intellectual property set forth on Exhibit A . . ." (*Id.*, Ex. T at 1) Exhibit A to the security agreement includes the following language:

> 3. TECHALT PATENT – US Patent Number 6,587,441 B1, issued July 1, 2003, and associated applications for transmission (i.e. images, audio, documents, etc.), storage, retrieval, viewing and output of customer data (the "IP").

(*Id.*, Ex. T at 15) The security agreement states that TechAlt "has, or will have upon the occurrence of the Merger[7] as defined in the Note, full title to the COLLATERAL." (*Id.*, Ex. T at 2)

Even if the court were to assume that state law permits Technology Alternatives to consent to TechAlt's inclusion of the '441 patent as security, the Illinois UCC provisions are preempted by § 261 of the Patent Act because Technology Alternatives and TechAlt never executed a written assignment. "Conflict preemption occurs when state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Ultra Precision Mfg. Ltd. v. Ford Motor Co.*, 411 F.3d 1369, 1377 (Fed. Cir. 2005) (quoting *Aronson v. Quick Point Pencil Co.*, 440 U.S. 257, 262 (1979)). The writing requirement imposed by 35 U.S.C. § 261 fulfills the policy of "surround[ing] the conveyance of patent property with safeguards resembling those usually attaching to that of land." *Westinghouse Elec. & Mfg. Co. v. Formica Insulation Co.*, 266 U.S. 342, 349 (1924). "[P]reemption is justified . . .

---

[7] Pursuant to the terms of the November 19, 2004 settlement agreement, Technology Alternatives became a wholly-owned subsidiary of TechAlt, and all of the shares of common stock of Technology Alternatives were exchanged for shares of common stock of TechAlt, but Technology Alternatives and TechAlt remained separate legal entities. (D.I. 19, Ex. V at ¶¶ 2.1,

19

to the extent that state law conflicts significantly with the writing requirement, or some other federal policy or interest." *Abraxis Bioscience, Inc. v. Navinta LLC*, 672 F.3d 1239, 1243 n.2 (Fed. Cir. 2011) (internal citations omitted).

In light of the foregoing authority, the court cannot overlook the absence of a written assignment between Technology Alternatives and TechAlt. The Federal Circuit has rejected the notion that common corporate structure can be used to overcome the writing requirement, holding that "even between a parent and a subsidiary, an appropriate written assignment is necessary to transfer legal title from one to the other." *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1366 (Fed. Cir. 2010) (internal citations omitted). Thus, TechAlt could not confer an interest in the '441 patent to SBD because it did not possess legal title to the patent, and recognition of an indirect transfer between Technology Alternatives and SBD would thwart the congressional objective of requiring a writing to transfer ownership of patent rights.[8]

Unlike the circumstances of the first break in the chain of title, *see* § IV.B.1, *supra*, the relationship between Technology Alternatives and TechAlt is not one of a creditor foreclosing on assets pledged by a debtor. The proper mechanism to transfer legal title to the § 441 patent to TechAlt was by way of written assignment, but Technology Alternatives and TechAlt never exchanged legal title. Technology Alternatives' alleged indirect transfer to SBD by operation of consent is preempted by the Patent Act for the reasons previously stated.

---

2.2, 2.3)

[8] Moreover, Mayfair's contention that the UCC sale resulted in an indirect transfer of the '441 patent from Technology Alternatives to SBD is based on a presumption that SBD acquired all of TechAlt's assets. However, Defendants have produced evidence that another entity acquired TechAlt's assets in October 2005, including rights under a contract between IBM and Technology Alternatives. (D.I. 29, Ex. 2 at ¶ 9) This evidence suggests that the October 31,

20

The Seventh Circuit's decision in *Matter of Pubs, Inc. of Champaign* is distinguishable because it addresses an estoppel argument.[9]  618 F.2d 432, 436 (7th Cir. 1980).  Application of the holding in *Matter of Pubs* to the present case suggests that Technology Alternatives is estopped from objecting to SBD's security interest in the patent.  It is not a doctrine that substitutes for actual transfer of legal title.[10]  Even if the court were to find that estoppel equates to an actual transfer of legal title, it is unclear who purchased the '441 patent in the foreclosure sale.  *See* § IV.B.3, n.8, *supra*.  For the foregoing reasons, I recommend that the court grant Defendants' motion to dismiss.

## C.    Bona Fide Purchaser

Mayfair contends that any defects in the chain of title are irrelevant to CRG, a bona fide purchaser that paid valuable consideration to acquire the '441 patent and was not aware of any defects in the chain of title until after it purchased the '441 patent.  (D.I. 28 at 12)  According to Mayfair, the documents in the PTO's files indicate that the rights to the patent application were transferred along the chain of title that led to CRG, and the PTO concluded that those documents were sufficient to issue the patent to Technology Alternatives.  (*Id.* at 13)

Defendants reply that a bona fide purchaser must take its title from an entity that actually

---

2005 UCC sale did not result in a transfer of all of TechAlt's assets to SBD.

[9] In *Matter of Pubs*, Pubs was the owner of the property in issue, having taken title pursuant to a bill of sale which recited a security interest in the property. However, the security interest was executed **after** title transferred to Pubs. The court ruled that Pubs was therefore estopped to deny the validity of the creditor's security interest since Pubs knew of the transaction, which was completed by the current officers / directors of Pubs, when they no longer possessed legal title to the property. *Matter of Pubs, Inc. of Champaign*, 618 F.2d 432 (7th Cir. 1980).

[10] James Solomon maintained ownership and/or management positions in Gooitech, 3P Networks, Sierra, Technology Alternatives, and TechAlt. These positions caused him to appear on both sides of several transactions regarding the attempted transfers of ownership rights to the '441 patent.

21

held legal title, and the fatal breaks in the '441 patent's chain of title leading up to SBD's alleged ownership preclude SBD from being considered a bona fide purchaser. (D.I. 29 at 4-5) Moreover, Defendants contend that CRG and Mayfair are not bona fide purchasers because they had actual, constructive or inquiry notice of defects which were readily apparent from the PTO records. (*Id.* at 5)

A bona fide purchaser is "one who purchases legal title to property in good faith for valuable consideration, without notice of any other claim of interest in the property." *Bd. of Trustees of Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 583 F.3d 832, 843 (Fed. Cir. 2009); *see also Rhone Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 284 F.3d 1323, 1329 (Fed. Cir. 2002). "It is well established that when a legal title holder of a patent transfers his or her title to a third party purchaser for value without notice of an outstanding equitable claim or title, the purchaser takes the entire ownership of the patent, free of any prior equitable encumbrance." *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568, 1573 (Fed. Cir. 1991). However, a purchaser from a seller who does not have legal title cannot assert the protection of the bona fide purchaser rule. *Rhone Poulenc*, 284 F.3d at 1329 (citing *Cook v. Eller*, 298 S.C. 395, 380 S.E.2d 853, 854 (1989) ("An individual cannot claim bona fide purchaser status if his grantor never had title to the property.")).

In the present matter, Mayfair is not a bona fide purchaser because Mayfair did not take its title from an entity that held legal title to the '441 patent. *See Filmtec Corp.*, 939 F.2d at 1573. As previously discussed, the break in the chain of title between Technology Alternatives and TechAlt prevented SBD from obtaining legal title to the '441 patent. *See* IV.B.3, *supra*. Therefore, SBD had no legal title to transfer or assign to CRG, and CRG had no legal title to

22

transfer or assign to Mayfair.

Moreover, Mayfair cannot be a bona fide purchaser for value because it had at least constructive or inquiry notice of defects in the chain of title to the '441 patent. The Patent Assignment Agreement between SBD and CRG provided CRG with a sixty day cancellation period during which CRG could cancel the agreement upon determining that the patents were not acceptable. (D.I. 19, Ex. DD) The publicly available records from the PTO reflected six original inventors, but only two assignments from the inventors were recorded. (*Id.*, Exs. D & E) CRG's failure to investigate the '441 patent's chain of title during the sixty day cancellation period precludes an application of the *bona fide* purchaser rule in the present matter. *See Leland Stanford Junior Univ.*, 583 F.3d at 843 ("'Notice' under § 261 can include constructive or inquiry notice, in addition to actual notice.").

## V.    CONCLUSION

For the foregoing reasons, I recommend that the court grant Defendants' motion to dismiss for lack of subject matter jurisdiction (D.I. 17), and deny as moot Mayfair's motion for leave to file a sur-reply brief (D.I. 30).

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b). The objections and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

23

The parties are directed to the court's standing Order in Non Pro Se matters for

Objections filed under Fed. R. Civ. P. 72, dated November 16, 2009, a copy of which is available

on the court's website, www.ded.uscourts.gov.

Dated: August 30, 2013

Sherry R. Fallon
UNITED STATES MAGISTRATE JUDGE

24

# ADDENDUM II

## U.S. PATENT NO. 6,587,441

US006587441B1

(12) **United States Patent** (10) Patent No.: **US 6,587,441 B1**

Urban et al. (45) Date of Patent: **Jul. 1, 2003**

(54) **METHOD AND APPARATUS FOR TRANSPORTATION OF DATA OVER A MANAGED WIRELESS NETWORK USING UNIQUE COMMUNICATION PROTOCOL**

(75) Inventors: **Jeffrey Urban**, Roselle, IL (US); **Jeffrey Barhorst**, Round Lake, IL (US); **Christopher C. Solomon**, West Chicago, IL (US); **Herbert Edwards**, Hoffman Estates, IL (US); **Chris Oltrogge**, Chicago, IL (US); **Adam Albert**, Schaumburg, IL (US)

(73) Assignee: **Technology Alternatives, Inc.**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/379,674**

(22) Filed: **Aug. 24, 1999**

**Related U.S. Application Data**

(60) Provisional application No. 60/116,856, filed on Jan. 22, 1999.

(51) Int. Cl.⁷ .................................................. **H04B 7/00**
(52) U.S. Cl. .................. **370/310**; 370/329; 370/395.51; 370/373
(58) Field of Search ................................ 370/392, 373, 370/395.51, 474, 471; 709/230, 246

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,777,657 A 10/1988 Gillaspie

| 4,807,282 A | 2/1989 | Kazan et al. |
| 5,181,200 A | 1/1993 | Harrison |
| 5,228,074 A | 7/1993 | Mizikovsky |
| 5,390,365 A | 2/1995 | Enoki et al. |
| 5,408,520 A | 4/1995 | Clark et al. |
| 5,410,752 A | 4/1995 | Scholefield |
| 5,428,671 A | 6/1995 | Dykes et al. |
| 5,446,736 A | 8/1995 | Gleeson et al. |
| 5,479,396 A | 12/1995 | Kusano |
| 5,481,562 A | 1/1996 | Pearson et al. |
| 5,519,704 A | 5/1996 | Farinacci et al. |

(List continued on next page.)

*Primary Examiner*—Hassan Kizou
*Assistant Examiner*—D Levitan
(74) *Attorney, Agent, or Firm*—Greenberg Traurig; Paul F. McQuade

(57) **ABSTRACT**

A wireless, redundant, secure, real-time, network for a proprietary interactive data transfer system having a remote terminal and a host data center, such as an automated teller banking system, is disclosed. Controllers for the remote terminal and the host data center receive the proprietary language messages and packetize and encrypt the messages for sending over the best wireless carrier among the plurality of wireless carriers the controllers are connected to. The wireless control protocol monitors the communications to provide for selection of the most reliable communication carrier for any part of a transmission. Each network segment of the signal path has at least one state-controlled gate which reports the status of that signal path. Real time transmission and acknowledgment of securely packetized messages on wireless communications carriers via an object oriented coding control application provides for reliable datagram transfer independent of the reliability of any one signal path.

**19 Claims, 11 Drawing Sheets**



# US 6,587,441 B1
## Page 2

### U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,532,939 A | | 7/1996 | Psinakis et al. | |
| 5,535,191 A | | 7/1996 | Park | |
| 5,544,222 A | | 8/1996 | Robinson et al. | |
| 5,546,397 A | | 8/1996 | Mahany | |
| 5,586,121 A | | 12/1996 | Moura et al. | |
| 5,627,822 A | | 5/1997 | Edmaier et al. | |
| 5,627,829 A | | 5/1997 | Gleeson et al. | |
| 5,640,686 A | | 6/1997 | Norimatsu | |
| 5,673,031 A | | 9/1997 | Meier | |
| 5,673,322 A | | 9/1997 | Pepe et al. | |
| 5,699,384 A | | 12/1997 | Dillon | |
| 5,732,346 A | * | 3/1998 | Lazaridis et al. ........... | 455/406 |
| 5,761,240 A | | 6/1998 | Croucher, Jr. | |
| 5,771,468 A | | 6/1998 | Stein | |
| 5,796,727 A | | 8/1998 | Harrison et al. | |
| 5,819,184 A | | 10/1998 | Cashman | |
| 5,841,764 A | * | 11/1998 | Roderique et al. ........... | 370/310 |
| 5,862,183 A | * | 1/1999 | Lazaridis et al. ........... | 235/381 |
| 5,970,059 A | * | 10/1999 | Ahopelto et al. ........... | 370/338 |
| 5,978,386 A | * | 11/1999 | Hamalainen et al. ........ | 370/338 |
| 6,011,790 A | * | 1/2000 | Fisher ....................... | 370/349 |
| 6,018,770 A | * | 1/2000 | Little et al. ................. | 709/223 |
| 6,137,800 A | * | 10/2000 | Wiley et al. ................ | 370/258 |
| 6,304,564 B1 | * | 10/2001 | Monin et al. ............... | 370/338 |

* cited by examiner



**Figure 1**

(Prior Art)



**Figure 2**



**Figure 3**

Packet Definitions

A. Initialization Packet (5 Byte Header / 0 Byte Payload)

| Packet Information | xxx0 0000 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |
| Version Number | XXXX XXXX |

Version Number Definitions
    1-Version 2.X
    2-Version 3.0

B. Single Packet (4 Byte Header / n Byte Payload)

| Packet Information | xxx0 0001 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |
| Data Payload (n Bytes) | XXXX XXXX |

C. Multi Packet (6 Byte Header / n Byte Payload)

| Packet Information | xxx0 0010 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |
| Total Packet Number | XXXX XXXX |
| Packet Sequence Number | XXXX XXXX |
| Data Payload (n Bytes) | XXXX XXXX |

## Figure 4

**(Continued on next page)**

Packet Definitions

A. Initialization Packet (5 Byte Header / 0 Byte Payload)

| Packet Information | xxx0 0000 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |
| Version Number | XXXX XXXX |

Version Number Definitions
　　1-Version 2.X
　　2-Version 3.0

**Figure 4a**

B. Single Packet (4 Byte Header / n Byte Payload)

| Packet Information | xxx0 0001 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |
| Data Payload (n Bytes) | XXXX XXXX |

**Figure 4b**

C. Multi Packet (6 Byte Header / n Byte Payload)

| Packet Information | xxx0 0010 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |
| Total Packet Number | XXXX XXXX |
| Packet Sequence Number | XXXX XXXX |
| Data Payload (n Bytes) | XXXX XXXX |

**Figure 4c**

D. Ack Packet (4 Byte Header / 0 Byte Payload)

| Packet Information | xxx0 0011 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |

**Figure 4d**

E. Resend Packet (4 Byte Header / n Byte Payload)

| Packet Information | xxx0 0100 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |
| Data Payload (n Bytes) | XXXX XXXX |

**Figure 4e**

F. Token Packet (5 Byte Header / 0 Byte Payload)

| Packet Information | xxx0 0101 |
|---|---|
| Sequence Number | XXXX XXXX |
| Circuit ID | XXXX XXXX |
| | XXXX XXXX |
| Status | 1234 5678 |

Bit 1 of the Status byte determines if the Token Packet is a Command or an Acknowledgement.
- 0 - Command
- 1 - Ack

Bit 2 through 4 are currently not used
Bits 5 through 8 denote the status.
- 0 - Open
- 1 - Close

**Figure 4f**



**Figure 5**



**Figure 6**



**Figure 7**



**Figure 8**



**Figure 9**



**Figure 10**



**Figure 11**



**Figure 12**



**Figure 13**



**Figure 14**



**Figure 15**



Figure 16

US 6,587,441 B1

1

## METHOD AND APPARATUS FOR TRANSPORTATION OF DATA OVER A MANAGED WIRELESS NETWORK USING UNIQUE COMMUNICATION PROTOCOL

This application claims the benefit of Provisional application Ser. No. 60/116,856, filed Jan. 22, 1999.

### BACKGROUND OF THE INVENTION

1. Field of the Invention

This invention relates to the transportation of data from one or more remote wireless terminals to one or more central hosts. It uses a system comprised of a managed, virtually constructed, wireless network and a communication protocol including a system of routing across unlike networks. The communication protocol is independent of the underlying physical network.

2. Discussion of Related Art

In the United States and Internationally, electronic commerce markets today are experiencing a fundamental shift from wired to wireless communications. This shift is being driven by the compelling economic advantage of wireless communication. Revenues can be increased through greater functionality and flexibility in remote terminal locations. The primary example used in this document is of financial institutions offering banking services to their customers by opening bank branches and deploying ATMs (Automated Teller Machines) at locations that allow them to reach their customers at sites remote from the main facility. Other industries also depend on secure, reliable data collection from remote locations including, but not limited to, security systems, health care, insurance, sales/service force management, and retail.

In the example of financial institutions, banking practice requires each ATM to communicate in real time with bank computers to confirm customer identities and associated banking privileges. This communication has heretofore been facilitated by increasingly costly and/or complex methods.

Initially the communication was done through the use of hard-wired methods. Leased Lines are expensive, take a long time to deploy, are maintenance heavy, and have no provision for redundancy unless more than one line is run. ISDN lines frequently require changes to the central host system and reprogramming and retraining of staff. ISDN lines have no ability to manage and monitor the remote terminal, have low reliability, unpredictable costs, inflexible transmission speeds and lower security of data. Dial-up telephone lines also require changes to the central host system, and carry disadvantages including the inability to manage and monitor the remote terminal, low reliability, unpredictable costs, slow transmission speeds and lower security. All of these hard-wired methods require coordination with multiple regional telephone companies simply to achieve national coverage. As today's industries grow into larger multi-regional or national entities, the hard-wired methods of connection of a remote terminal to the central host system become unmanageable and prohibitively expensive.

To reach terminals in more remote or transient locations, to more quickly deploy communications to remote terminals and to process more transactions, and to reduce the number of transactions lost due to communications failures, the communications path needs to be more reliable than ISDN, Dial-Up or Native Wireless communications. Greater reliability also allows for the implementation of an increased variety of transaction applications, as many of the new applications are more data-intense and require more reliable communications simply to succeed. Therefore, many industries including banking, turned to cellular communications, proprietary radio communications and satellite communications to deliver remote terminal communications. The ability to reach remote terminals in more remote or transient locations increased the number of terminals. Reaching terminals more quickly allowed remote users to be connected and productive sooner. Both contribute to larger transaction volumes. However, the native cellular, radio and proprietary communications technologies have associated problems.

Circuit switched cellular communications have the same problems as dial-up lines, including required changes to the central host system, inability to manage and monitor the remote terminal, lower reliability and security, unpredictable monthly costs and slow transaction speeds. In addition, circuit switched cellular communications are more expensive and less reliable than dial up due to the high pricing structure and the inherent unreliability of the cellular network. Finally, the cellular networks are regional or metropolitan based, with no single cellular network providing nationwide coverage for all types of protocols.

Proprietary radio communications share most of the problems of cellular communications. Proprietary radio offers lower monthly communication costs, but this is offset by the high start up cost associated with building the proprietary radio towers to establish communications. In addition, the ability to locate or relocate a remote terminal site is limited by the proximity to the tower set up for communications.

Satellite communications offer nationwide coverage as opposed to the regional coverage offered by cellular or radio communications. Satellite communications typically offer network-like bandwidth. However, because satellite networks are often designed more for data transmission than for transaction processing, there are problems associated with processing transactions via satellite links. The latencies inherent in the data transmission based satellite network are frequently incompatible with the time delay tolerances set up by network transport protocols for the purpose of maintaining the integrity of the transaction. These latencies are exacerbated as the system seeks to recover lost data.

In addition to the problems listed above with various communication devices and methods, the current standard protocols (e.g. TCP/IP, X.25, 3270, SNA/SDLC (Systems Network Architecture/Synchronous Data Link Control) and others) have additional problems that exacerbate their ability to transport data securely and reliably over the wireless network. Protocols define the rules of interaction between devices attached to the network. These standard protocols are limited in their effectiveness over the wireless networks because of inadequacies in working within time constraints, inadequacies in security, inability to communicate with dissimilar protocols and network topologies, and the unavailability of single, national network supporting CDPD (Cellular Digital Packet Data), GSM (Global System for Mobile communication), and G3 (generation 3) wireless protocols.

While there are national wireless networks available, BellSouth Intelligent Wireless Data Networks (BSWD Mobitex) is not compatible with other standard protocols used by older host systems, thus requiring expensive and extensive upgrading of the entire host system. The national wireless networks, Hughes network, Space net and BSWD Mobitex all share the problem of latencies in the network and reliability problems in actual use. Another wireless

3

transport protocol, UDP/IP, has the additional problem of data loss during the communication process. None of the standard devices and methods of wireless data transportation have the ability to transition between different transport protocols or across different wireless networks.

Because many remote terminal applications are driven by host computers resident on older infrastructures, the host computers use different protocols than those supported by the wireless networks. In order for a wireless communication to get to the host computer, there must be a conversion from the wireless protocol to the host protocol. Even where an application is written to work on a wireless network, differences in the protocols supported by the different wireless networks render the communication ineffective on different wireless networks. For example, many of the current networks use the TCP/IP protocol, but the BSWD Mobitex system does not accept that method and has devised a separate protocol. Thus, an application written to communicate over TCP/IP would be ineffective over a BSWD Mobitex network. This limits the applicability of wireless networking to usability over a single communication network and forces the host to accept that network's limitations.

Previously, no combination of communication network and protocol offered easy seamless and reliable communications from remote and mobile locations. The simple definition of the path from the remote device to the host could be challenging when the two devices were attached to different networks using different protocols. There are few devices available that perform protocol conversions between communicating devices in dissimilar network environments. Of those devices that do perform protocol conversions, they all fall short of the need to connect remote communicating devices quickly because of their inability to resolve the inherent losses of data communications over the wireless network. The navigation of transaction data over the wireless networks and then over the native host networking environment is difficult and unreliable.

Therefore, to overcome the limitations of the wireless communications strategies and provide easy, seamless redundancy, what is needed is a method of operating a managed wireless network and an embedded protocol that improves the performance, reliability, and coverage area of wireless networks for the electronic commerce host and its customers.

## SUMMARY OF THE INVENTION

The present invention discloses means and method for reliable real time transmission between multiple host system remote terminals and host server terminals of proprietary design. The invention uses independent modules at the host and remote terminals which overlay the proprietary host language in order to transmit secure datagrams over a multiplicity of real time secure wireless carriers. The invention verifies message receipt and monitors transmission link reliability in order to select the most reliable channels for message transmission. Nonperforming channels are shut down throughout the system to prevent faulty or incomplete transactions between the host and remote terminals.

The remote terminal module and host server module are essentially mirror image signal paths which, via embedded software objects, strip the transmission headers from the outbound terminal messages, and packetize, encrypt, and reformat the message package as "data" within a wireless control protocol managing the data flow, control, receipt, and state management within a virtual wireless network. It will be appreciated that each time a header is stripped from

4

the message the network segment connection is terminated. The reformatted messages are then again formatted for sending over a selected one of a plurality of known wireless carriers to which the virtual network subscribes. At the in-bound module the message is identified, unformatted, unencrypted, acknowledged as received, routed, and reformatted for suitable communication to the proprietary host system. Should the transmission fail, the failed channel is shut down by the state management system and the message is resent over the alternate wireless carrier. If the alternate message transmission fails, the host system terminals are notified and shut down. It will be appreciated that a great number of alternate transmission links may be enabled by the present invention and that the transmission systems need not necessarily be wireless.

Generally, the present invention creates three network segments in the signal path, or circuit, from the remote terminal to the server terminal of the host. A remote terminal network segment exists from the remote terminals to the remote terminal control module. A wireless network exists between the remote terminal control module and the server control module utilizing redundant wireless carrier connections. A host server network segment exists between the server control module and the host server. The network segments are intelligently linked by channel management objects in the software within each control module. Therefore, each network segment is aware of the others' status and message transmission can be regulated and controlled throughout the circuit even though the wireless network segment is, in essence, undefined until the time of message transmission.

Further, by utilizing the wireless control format of the present invention, any wireless transmission system can be accommodated because the wireless control format overlays its own addressing layer, including a logical address, onto transmitted messages. Thus, the wireless control format can still provide the ability to service multiple logical connections through a particular network segment, whether the transmission system of that segment has provided for logical addressing or only for physical addressing. For instance, a plurality of grouped automated teller machines (ATMs) may be conveniently remotely located and communicated with utilizing only one wireless transmission apparatus running a transmission application which supports only physical addressing.

Thus, it is among the objects of the present invention to provide a wireless control protocol for a redundant wireless network link between proprietary host terminals.

It is a further object of the present invention to provide a module, or modules, overlaying the proprietary host terminals and providing for communication through a secure, redundant, wireless, real time network for communications between the proprietary remote and server terminals.

It is a further object of the present invention to provide means and method for such a redundant wireless network which manages communication between the remote and server terminals according to receipt or non-receipt of message traffic between the host terminals.

## BRIEF DESCRIPTION OF THE DRAWINGS

The described and further advantages of the present invention may be further clarified by the accompanying drawing and their description in which like parts are identified by like reference numbers.

FIG. 1 illustrates prior art solutions for remote ATM connection with a host server.

5        6

FIG. 2 illustrates the general concept of the redundant wireless network of the present invention.

FIG. 3 is a diagram of the Data Flow between the Remote Terminal and the Host server terminal showing the terminal controller modules.

FIG. 4 illustrates the six types of packets needed for the wireless control protocol: Initialization, Single, Multi Packet, Acknowledgment, Resend and Token.

FIG. 5 illustrates the flow diagram of the normal exchange of the Initialization Packet between controller modules.

FIG. 6 illustrates the flow diagram of a successful transmission of a Single Packet message

FIG. 7 illustrates the flow diagram of a transmission of a Single Packet message with packet loss and subsequent retransmission.

FIG. 8 illustrates the flow diagrams of the unsuccessful transmission of a Single Packet message where all retransmissions of the packet are lost and the transaction times out.

FIG. 9 illustrates the flow diagram of a successful transmission of a Multi Packet message.

FIG. 10 illustrates the flow diagram of a transmission of a Multi Packet message with packet loss, the determination of the missing packet data section and the retransmission of the missing packet data sections.

FIG. 11 illustrates the flow diagram of a transmission of a Multi Packet message with last packet loss.

FIG. 12 illustrates the flow diagram of the unsuccessful transmission of a Multi Packet message where all retransmissions of the packet are lost and the transaction times out.

FIGS. 13–15 illustrate examples of state propagation between Side A and Side B of a channel manager object of a controller module.

FIG. 16 illustrates in table form state propagation action between Side A and Side B of a channel manager object.

## DETAILED DESCRIPTION OF THE PRESENTLY PREFERRED EMBODIMENTS

Referring to FIG. 2, a virtual wireless network 21 according to the present invention provides a proprietary host server terminal 23 and first and second remote terminals 25, 27 with a server terminal control module 29 and a remote terminal control module 31. For convenience of description the server terminal will be designated the upstream end of the signal chain. The server terminal control module 29 is in data communication at its upstream or terminal side with the host server 23 typically through a connection-oriented communication protocol, e.g., SNA/SDLC, over a land line 33. The server terminal control module 29 is equipped at its downstream, or wireless, side with apparatus for a plurality of wireless transmission carriers represented by first and second wireless communication means 35, 37, respectively, of differing topologies, or formats.

Examples of known wireless communication formats are BSWD Mobitex, CDPD, and VSAT (Very Small Aperture Terminal) which may be provided by various commercial entities for wireless transmission services.

The remote terminal control module 31 is in data communication at its downstream, or terminal, side with a plurality of remote terminals represented by the first and second remote terminals 25, 27; typically, although not necessarily, through a connection-oriented communication protocol, e.g., TCP/IP or Burroughs Async, via land lines 39, 41. The group of remote terminals may be interconnected via an ethernet network or the like, represented by dotted

arrow 43, and communicate with the remote terminal controller 31 via a single line connection. The remote terminal control module 31 is equipped at its upstream, or wireless, side with a plurality of wireless transmission carriers represented by first and second wireless transmission communication means 45, 47 matching those of the wireless, or interchange, side of the server terminal control module 29 for communication therewith.

Referencing FIG. 3, the circuit, or signal path, between the server terminal 23 and one remote terminal 25 will be detailed with emphasis on uninterrupted data flow through the software objects contained within the digital electronics of the terminal control modules 29, 31.

Each control module 29, 31 essentially creates a mirror image signal path for message movement. Thus an incoming signal to either module will be treated essentially the same in each module, as will an outgoing signal. Each control module 29, 31 preferably comprises a virtual signal path of embedded functional software objects including terminal side Channel and Com Object pairs dedicated to each host system terminal and alternate, or multiple, interchange side Com and Channel pairs, with each dedicated to a selected wireless communication means. Although interchange between the two terminal controllers is shown as wireless, it will of course be appreciated that wired data carriers could also be used within the context of the present invention. Between the terminal side Channel/Com pairs and the interchange side Channel/Com pairs, and in communication therewith, are the Channel Manager Objects.

While the physical layout of FIG. 3 is shown as two modules between two host system terminals, it is useful in some aspects to think of the signal path or network as having three network segments: a remote terminal network segment 50 encompassing communications with the remote terminal; a wireless network segment 52 encompassing wireless communications between the control modules; and a host server network segment 54 encompassing communications with the host server. The Channel Manager Objects then link each of the three network segments together.

A customer transaction requires real time communication between the remote terminal 25 and the host server 23. The customer enters the request at the remote terminal. The request or corresponding instructions from the server 23, with all components thereof will be referred to hereinafter as a message. The message, in the proprietary format of the host system, is then formatted in the connection-oriented communication protocol, e.g. TCP/IP, for transmission over the land line 39 to the terminal side 49 of the remote terminal control module 31. The message from the remote terminal 25 is received on the terminal side by the software object Com 51 and has the connection oriented land line transmission protocol, e.g., TCP/IP, headers and the like, removed by the Com object 51. At this point the message is bare and consists only of address data and transaction data in the host proprietary language. The terminal side Com Object 51 then sends the message to its paired Channel Object 53. Each Channel Object in the signal chain will check the circuit addresses and validate the source, i.e. the sender, of the incoming messages. The Channel Objects of the control modules act in one capacity as state-controlled gates of the signal path, as further explained below. In the present instance the terminal side channel object 53 of the remote terminal control module 31 may be considered a pass-through object, although additional functionality may be added to accommodate other data flow scenarios outside the scope of the present invention.

The Channel Manager Object 55 then polls its interchange side first and second channel objects 57, 59, respectively,

7

and accepts the bare data message provided there is an OPEN Channel Object upstream, or outbound, to pass the message to. The message is assigned by the Channel Manager Object 55 to the OPEN Channel Object 57, 59 with the highest priority, as set by the system administrator, software application, or default. The wireless-side channels 57, 59 are uniquely associated with one form of wireless communication means 45, 47. The bare message is taken by the selected Channel Object, e.g., 57, and given a wireless control format header to make a packet in preparation for transmitting via the associated wireless transmission means, including., e.g., the first interchange side Com Object 61 of the remote terminal control module 31, if that is an OPEN channel with the highest priority. If not, the packet is sent to the alternate Com Object in preparation for sending by the second wireless transmission means 47.

The wireless control protocol header is placed at the front of all wireless transmission packets between modules 31, 29 in order to address the message with both physical and logical addresses and track receipt of transaction messages and all other wireless traffic, as further explained below. With the assignment of a wireless control header the bare message has become a packet and entered the wireless network segment of the signal path, which is controlled by the wireless control protocol. The Channel Object 57 further parcels the message into more than one packet if the message exceeds the maximum transmission unit length for the wireless network being used.

In addition to its packetization duties, the Channel Object 57 further maintains its function as a state-controlled gate in the signal path. The Channel Object 57 may also be assigned additional functions such as inbound message authentication or other additional functionalities as dictated by other data flow scenarios outside the scope of the present invention.

The packet, i.e., a wireless control protocol header and the original addressing and message from the remote terminal which is now treated as a data field at the end of the packet, is handed to the first interchange side Com Object 61 to prepare it for wireless transmission, provided this particular path of the wireless network segment is OPEN upstream. The Com Object 61 will encrypt the packet by known methods such as encryption programs available from RSA Data Security Incorporated. The remote terminal interchange side Com Object 61 then adds the wireless communication format headers, e.g. for BSWD Mobitex, and checks packet lengths against the wireless communication for maximum transmission unit length. The Com Object 61 then places the packetized message onto the first wireless transmission carrier means 45 for sending to the server control module 29. The associated Channel Object 57 initiates at least one transmission timer waiting for an acknowledgment that the packet or packets were received by the server module 29, as further explained below.

The packet, with the wireless communication format headers, the wireless control protocol header, and the base message contained therein as data, is received at the server terminal control module 29 by the first physical wireless communication means 35 and the first interchange side Com Object 63 of the server terminal control module 29. The wireless communication format headers are stripped from the packet. The interchange side Com Object 63 first decrypts the packet then reports the address of the packet to the interchange side Channel Object 65. The Channel Object 65 compares the address of the packet in the wireless control format header to its list of valid channel addresses to determine if the packet is for a valid channel within that server terminal control module 29. If not, the packet is

8

discarded. If a valid address is present in the wireless control format header the Channel Object 65 generates and the Com Object 61 sends to the remote terminal control module 31 an acknowledgment that the packet was received and the intended Channel Object is in the OPEN state. The Channel Object also assembles multipacket messages. If not all packets of a multipacket message were received, a Request to Resend the missing packets is sent. The Channel Object 65, upon comparing the remote physical and logical addresses as reported by the Com Object 63, if a match is found, removes the wireless control protocol header and passes the bare message to the Channel Manager 67 of the server terminal control module 29. The Channel Manager 67 then sends the bare message to the terminal side Channel Object 69 associated with the correct host application. Again, the terminal side channel 69 of the server control module 29 is essentially a pass through or place holder device in the context of the present invention. The Channel Object 69 forwards the base message to its paired terminal side Com Object 71. The terminal side Com Object 71 then constructs the message with appropriate headers for the land line communication format, or protocol, to the server 23. At that point the "data" of the packetized transmission, i.e., the original message from the remote terminal 25, is read and responded to by the server 23 in the reverse, or downstream, direction through the signal path.

The wireless control protocol is implemented as a state machine application to control message transfer through each Channel Object and to ensure reliable message transfer throughout the wireless network. A discussion of the wireless control protocol and the message packet headers used during its implementation follows.

FIG. 4 shows the six types of packets used to implement the wireless control protocol. They are: Initialization, Single Data, Multi-Data, Acknowledgment, Resend, and Token, packets. All packets used in the wireless control protocol begin with the same three fields. These three fields constitute the wireless control protocol header. The first field in the header is the Packet Information Field, followed by the Sequence Number field and the Circuit Identification field.

The Packet information field conveys the type of packet being sent. It can further be used to denote the existence of an extended header which will allow for future expansion of the header frame.

The Sequence Number field conveys a unique identifier for each packet to prevent packet duplication. For example, if an acknowledgment message is lost and data is retransmitted, it is possible for the receiving side to receive two copies of a packet. The sequence number is used to keep a history of what has been received and propagated so that the second copy may be discarded. The sequence number further allows the Channel Object to enforce packet sequence propagation ordering. This allows the packets to be delivered to the receiver in the same order as they were sent.

The Circuit Identification field conveys the unique circuit path which the packet is to travel. This identifier allows the mux/demux capability for multiple Channel Objects to use the same Com Object. It is in this field that the Com Object matches it's internal mask, or template, against to determine which circuit the data belongs to, thus allowing the Com Object to demux a data stream across multiple channels. The mux/demux mechanism also provides a measure of security because the proper header with the proper Circuit ID needs to be on the data for it to be validated by the Channel Object and passed through a given circuit.

The first data packet type is the Initialization Packet (A). It is sent when initializing a channel any time a channel is

9                                                            10

moving from offline to ONLINE. It is used both to negotiate the version of the wireless protocol that will be used and to reset the sequence number of the receiving channel to maintain proper sequencing. This packet contains the wireless control protocol header and a one byte protocol version number field. The Packet Type subfield in the Packet Information field is set to binary XXX0 0000. Following this are the Sequence Number and the two byte Circuit Identification fields. The protocol Version Number is the last field.

The second type of data packet is the Single Packet (B). The Single Packet (B) is used to carry data between devices when the data will fit in one packet. This packet contains the wireless control protocol header and an n byte payload field. The Packet Type is set to binary XXX0 0001. Following the Packet Type designation field are the Sequence Number, the WEC Circuit Identification and the variable length Data fields.

The third type of packet is the Multi Packet. This is used when the data to be sent will not fit into a Single Packet. This packet contains six fields, a six-byte header and n byte payload. The Packet Type is set to binary XXX0 0010. The fields following the Circuit Identification field are the Total Packet Number field which indicates the total number of Multi Packets to be sent, the Packet Sequence Number field which gives the place of this packet within the string of packets comprising the message, and the variable length Data Payload.

The fourth type of packet is the Acknowledgment Packet (ACK). This packet is sent from the receiving module to acknowledge the receipt of a packet. It contains the three header fields common to all packets, making a four byte header and 0 byte payload. The Packet Type is set at XXX0 0011.

The fifth type of packet is the Resend Packet. This packet is used to request the retransmission of specific packets that were sent in Multi Packets but not received. The Packet Type is set at XXX0 0100. It contains the wireless control protocol header and an n byte payload field with each byte containing the Packet Sequence Number of a missing packet.

The sixth type of packet is the Token Packet. The Packet Type is set at XXX0 0101. There is no data payload. This packet type is used to test the system i.e. polling, and is a "heartbeat", i.e. a polling signal sent at intervals to check the network connections. The heartbeat contains operating state information necessary for maintaining synchronization between the two sides of the wireless network segment. The Token Packet is used to propagate state information throughout the signal chain. It is also used in the polling and acknowledgment activity of the protocol which continuously monitors the signal path status during any time of message nontransmission. Accordingly, the Token packet can be set as either a command or acknowledgment. After the wireless control header fields is a one byte Status field composed of 8 bits. Bit 1 determines if the Token Packet is a command (propagation), set at 0, or an Acknowledgment (status report), set at 1. The Acknowledgment of the Token Packet, or Acknowledgment Token, acknowledges a state change command rather than a packet transmission. There is always a packet acknowledgment (Acknowledgment Packet) sent for every Token Packet whether it is a command or an acknowledgment. Bits 2 through 4 are not currently used. Bits 5 through 8 denote the status, with 0000 as OPEN and 0001 as CLOSE.

State control for the Channel Objects is based on the sending module receiving an Acknowledgment Packet from the receiver that the sent packet was received by the receiving module. Generally, if no Acknowledgment Packet is received, the protocol issues a command to change the Channel Objects states from OPEN to CLOSE or Offline.

FIG. 5 illustrates the pathways used in initializing communication between two terminal control modules. It will be understood that communication between the modules is bidirectional and the direction of the illustrated path is for explanatory purposes only. Either module can send an Initialization Packet to the other. The Initialization Packet is sent upon first starting the system or at any transition from OFFLINE to ONLINE status. The Initialization Packet indicates the version of the wireless control protocol the sender expects to use. Upon receipt 83 of the Initialization Packet, the receiver resets its sequence number and responds with an Acknowledgment Packet 85 which is received by the sender. Both modules (29, 31, FIG. 3) are now set to the same sequence number, allowing any data loss to be detected and avoiding out of sequence errors when one side of the connection is reset. If the Initialization Packet is not acknowledged after a prescribed number or time of retries, then a change of state command Token is sent and the channel changes to the OFFLINE state.

FIG. 6 illustrates successful transmission of a single packet. The sending module sends 89 the Single Packet. When the Single Packet is received 91, the receiver (E) responds 93 with an Acknowledgment Packet which is received 95 by the sender. The channel objects remain OPEN, no change of state is necessary.

FIG. 7 illustrates the process of a Single Packet successful retransmission after an initial packet loss, or transmission failure. The sender sends 97 a single Packet. The sender then starts a Transaction Timer 99 and a separate Retransmission Timer 101 as soon as the Single Packet is sent. In this drawing, the transmission fails 103. Because the receiver module does not send an Acknowledgment Packet by the time the Retransmission Timer 103 expires, the sender module resends 105 the Single Packet, with the same sequence number, and restarts the Retransmission 101. In this example the retransmission is successfully received 107 and an Ack packet is sent 109 by the receiving module and received 111 by the sending module. Timing out of the retransmission timer and resending of the data packet would continue until an Acknowledgment Packet is received by the sender or the Transaction Timer 99 expires. If the Transaction Timer 99 expires, the transmission is aborted as a failure and the maximum failuire count is reached a state change will then be implemented for that channel object, closing that circuit path. Another wireless transmission means will be tried for sending the packet.

FIG. 8 illustrates the flow of a Single Packet transmission that failed. The sender module sends 113 a Single Packet which begins the Transaction Timer 99 and Retransmisson timer 101. Send 113 fails 115 and Retransmission timer expires 117. The sender resends 119 the Single Packet with a second failure 121. The Transaction Timer expires 123 and the transmission is aborted. A delivery failure count is incremented by the sending Com Object for that channel. The Channel Manager Object hands the packet to the next highest priority channel for retransmission 125. This transmission also fails repeatedly 127. Upon expiration 131 of the second Transaction Timer 129, the channel failure count for that channel is incremented.

Once all transmissions have failed the transaction is then destroyed 133 and, if the failure has incremented to a maximum amount on all channels, the selected circuit will

US 6,587,441 B1

11

be shut down and connections to the remote terminal and the server being closed to allow the selected applications to denote communications failure in the appropriate manner to the user.

FIG. 9 illustrates a successful transmission of a multi B packet message. The sender interchange side Channel Object encapsulates the data into separate Multi Packets to be sent with successive sequence numbers. The Total Packet Number field is included in the first Multi Packet sending 135 to tell the receiver module how many packets to expect. The Packets are then sent serially 137, 139. In the figure, each packet is received 141,143,145. The receipt of the last packet 145 has the protocol issue a signal to check for missing sections of the data transmission. If all of the data packets are received successfully, the receiver module sends an Acknowledgment Packet 147 which is then received 149 by the sender module. No change of state takes place.

FIG. 10 illustrates the flow of a successful Multi Packet transmission with one packet transmission failure. The Sender module sends a first Multi Packet 151. This action starts the Transaction Timer 99. The first packet fails to arrive 152 at the receiver module. Second and Third packet sends are received successfully 153, 155. Each packet conveys how many Multi Packets there are in the message. If the last packet in the sequence is received 155 and any preceding packets are missing, in this case the Delivery Failure 152 of the first packet, the receiver sends a Resend Packet 157 specifying, in the Data Payload field, which packets are missing. Upon receiving the Resend Packet, the sender resends the missing first packet 159 plus the last packet 161 of the sequence. The resend is transmitted successfully and the receiver module transmits an Acknowledgment packet 163 which is received. The sender terminates the transmission upon receipt of the Acknowledgment Packet 165.

During the transmission of a Multi Packet sequence, the Transaction Timer 99 is running and the sender module aborts the transmission as a failure if the Transaction Timer (D) expires before the total transmission can be completed. State changes may be initiated and the message is scheduled for transmission over an alternate wireless transmission means.

FIG. 11 illustrates the flow of a Multi Packet transmission with a last packet transmission failure. The Sender sends a message in three Multi Packets 167,169,171. The first send 167 starts the Transmission Timer 99 and Retransmission Timer 101. Packet 1 of 3 and Packet 2 of 3 are successfully received 173,175. But the last packet, which carries the signal to check for missing packets, is lost during transmission 177. Therefore, the retransmission timer of the sender is relied upon for successful delivery of the message. After the Retransmission Time has expired 179 the last packet is resent 181. Upon receipt 183 of this last packet by the receiver module, the receiver checks for missing packets and sends an Acknowledgment Packet 185 if all the packets have been successfully received. If any other packets are missing, the receiver of course sends a Resend Packet specifying the packets to be resent as described previously.

FIG. 12 illustrates the flow of a Multi Packet transmission that was unsuccessful. The sender module sends a first Multi Packet 187 which begins the Transaction Timer 99 and Retransmission timer 101. In the situation shown the first Packet of the Multi Packet Sequence 1 of 3 arrives at the receiver module successfully 189. Sequence Number 2 of 3 and Sequence Number 3 of 3 experienced Delivery Failure 191,193, respectively. When the Retransmission Timer 101

12

Timed Out 194, or expired, Packet Sequence Number 3 of 3, the last packet, was resent 195, restarting the retransmission timer 101. This transmission also failed 197. When the restarted Retransmission Timer 101 again Timed Out 198, Packet Sequence Number 3 of 3 was resent 199. This transmission also failed 201. The Transaction Timer expired 203 and the transaction was aborted 205. The failure count for that channel is incremented and the Channel Manager Object will schedule the message for resending through the alternate wireless transmission means.

State Changes

As previously mentioned, the wireless control protocol is implemented as a state machine controlling the operational states of the Channel Objects. There are three operational states for a channel object and two transitional states. The operational states are OPEN, CLOSED, and OFFLINE. The transitional states, used to denote transitions between the operational states, are OPENING and CLOSING. The OFFLINE state, or channel object status, occurs when a network segment has failed and is unlikely to resume communication without intervention. An example of such failure could be the physical failure of a wireless transmission apparatus in the controller modules, such as a broken wire to the antenna or the like. The OPEN state exists when the entire network segment is operating normally. CLOSED is a channel object status in a network segment where communication is likely to resume without intervention, and is in response to an OFFLINE state in another part of the circuit. As an example, if the terminal side channel object on the server controller was OFFLINE as described above, the Remote Terminal control module channel objects would be in CLOSED state. The two transitional states, CLOSING and OPENING, indicate the movement from one operational state to another, and propagate their message to change operational states throughout the signal chain until receipt of an acknowledgment signal from a terminal.

FIGS. 13–15 illustrates an example of state propagation through the Channel Objects 53,57 in a terminal control module, e.g. the Remote Terminal control module 31, between the channel objects of the interchange side and the channel object of the terminal side, in diagram form. One interchange side channel object will be described for simplicity sake. FIG. 13 illustrates the normal operating condition, with both sides Channel Objects 53,57 OPEN and able to send or receive data. FIG. 14 illustrates that there has been some type of connection failure 201 on the terminal side, e.g. a cut cable, destruction of the Remote Terminal, or other physical cause of failure that has caused the terminal side Com Object 51 to place the terminal side Channel Object 53 in an OFFLINE state. When the Channel Manager Object 55 polls the terminal side channel object 53 and receives no acknowledgment, it discovers the OFFLINE state and closes the interchange side channel object, as there is no communication through the terminal side of the module on that channel path. When the interchange side Channel Object 53 receives the Channel Manager Object command to close, it proceeds to go to a CLOSING state and send a Token Packet with a CLOSE command to it's paired channel. The Closing state, like the other transition state, Opening; is propagated throughout the rest of the signal path until a terminal acknowledges receipt, at which time the Channel Objects move to the CLOSE operational state. FIG. 15 illustrates that the CLOSE state is propagated to the corresponding server control module wireless network segment by sending the CLOSE command Token Packet over the wireless transmission means. Once the server control

13

module Acknowledges receipt of the CLOSE command, the remote terminal interchange side channel 57 moves to the CLOSE state. The server module Channel Manager Object (67, FIG. 3) then propagates the close command to its terminal side channel object by sending an Acknowledgment Test Token. There is no communication over this channel path until the OFFLINE state is reversed. Repeated transmission failures to this Remote Terminal channel may signal the server to issue a message to check on the specific location Remote Terminal.

FIG. 16 illustrates in table form the possible propagation actions in response to state changes between Side A, the X axis, and Side B, the Y axis. Essentially FIG. 14 is a look up table for the Channel Manager Object. In response to state changes in the channel objects within a module, e.g. side A could be terminal side and side B could be the interchange side; the Channel Manager Object will look at the change in status for a channel object on one side (axis) and the current status of the other side (axis) and take the action listed in the box where the axes cross. An empty box means take no action. The double boxes provide two options for action. The action selected depends on which side (A or B) last changed. For instance, if the device is in a CLOSING/OPEN state, the action taken depends on if side A just moved to Closing or if side B just moved to OPEN. If it was side A that just changed, then the Channel Manager Object would choose the bottom option, CLOSE B. If side B was the side to just change, it would choose the upper box and OPEN A.

By following the teachings of the present invention the ordinarily skilled artisan will derive means and methods for a reliable real time redundant wireless transmission system between multiple system remote terminals and server terminals of proprietary design.

While the present invention has been described in terms of a preferred embodiment, many variations will become apparent to the ordinarily skilled artisan upon study of the teachings herein. The present invention is therefore intended to be limited only by the appended claims.

We claim:

1. Apparatus for transmission in a system including a signal path having an upstream server terminal and a downstream Remote terminal of proprietary host language protocol, comprising:

a) a signal chain including;

b) a server terminal controller downstream of and in signal communication with the server terminal;

c) a Remote terminal controller upstream of and in signal communication with the Remote Terminal; each terminal controller having a terminal side and a interchange side of its signal chain;

d) a signal transmission carrier of different protocol than the proprietary host language between the Server and the Remote terminal controller and the Remote terminal controller;

e) each terminal controller having a terminal side with paired Com and Channel Objects communicating with one of the Remote Terminal or server terminal, and a interchange side having a plurality of Channel Objects communicating with a Com Object dedicated to each signal carrier protocol;

f) each terminal controller having a Channel Management Object interfacing between the terminal side paired Com and Channel Objects and the interchange side plurality of Channel Objects;

g) the Server and Remote terminal controller interchange side Com Objects interfacing with the plurality of signal transmission carriers;

14

h) the terminal side of Com Objects doing protocol translation, including adding/subtracting terminal communications headers, and message packetization and encryption between the Remote terminal and the Remote terminal controller, and between the Server and the Server terminal controller, and the terminal side Com Objects monitoring their connection to the terminals;

i) the interchange side Com Objects acting to mux/demux messages intended for the terminal controllers or their associated system terminals, or both, and adding or subtracting signal carrier protocol;

j) the channel objects monitoring message transmission/ failure activity and acting as gates in the signal chain and having multiple operational states including: OPEN, CLOSE, OFFLINE; and two transitional states: OPENING and CLOSING; and the interchange side channels adding/subtracting terminal controller protocol message headers, timing message transmissions, issuing resend requests, assembling and acknowledging received messages; and controlling state changes within the channel;

k) the Channel Management Object polling and monitoring the Channel Object states and assigning them to carry messages to said states, and propagating said state changes along said signal path.

2. The apparatus of claim 1 wherein the signal transmission carrier is wireless.

3. The apparatus of claim 1 wherein there are a plurality of signal transmission carriers.

4. The apparatus of claim 3 wherein the plurality of signal transmission carriers are wireless.

5. Apparatus for redundant transmission in a system including a signal path having an upstream server terminal and a downstream Remote Terminal of proprietary host language protocol, the path having a server terminal leg, a Remote Terminal leg, and an interchange transmission leg; comprising:

a) a terminal controller having
   a terminal side and a interchange side,
   a Com Object and Channel Object pair on the terminal side
   a Com Object and multiple Channel Objects on the interchange side

b) a Channel Manager Object between the terminal side channel and the interchange side multiplicity of channels;

c) the Com Object doing message header translations between protocols & mux/demux of messages between multiple Channel Objects;

d) the Com Objects being placed at juncture points with communications outside the controller;

e) the Channel Objects being placed between the Com Objects and the Channel Manager Object

f) the Channel Objects monitoring message failure, and changing operational states to act as gates in signal path;

g) the Channel Manager Object doing polling and selection of channels.

6. A method of transmission in a signal path having an upstream server terminal and a downstream Remote Terminal of proprietary host language protocol, comprising:

a) establishing a server terminal controller connection with a server;

b) establishing a remote terminal controller connection to the Remote Terminal;

US 6,587,441 B1

**15**

c) receiving a Remote Terminal message;

d) stripping the Remote Terminal message down to pro-
duce data message with only data and address infor-
mation;

e) packetizing and encrypting the data message;

f) adding a terminal controller header to the data message
to produce a terminal controller message;

g) selecting a signal carrier and assigning the terminal
controller message to transmission on said signal car-
rier;

h) adding a signal carrier header to the terminal controller
message to create a signal carrier message;

i) transmitting the signal carrier message on the selected
signal carrier to the server terminal controller;

j) stripping the signal carrier header to recreate the ter-
minal controller message;

k) checking the server address in the terminal controller
message;

l) assigning the message to the intended server channel
and stripping the terminal controller header; and

m) acknowledging receipt of the message by the server
terminal controller to the remote terminal controller.

7. The apparatus of claim **6** wherein the signal transmis-
sion carrier is wireless.

8. The apparatus of claim **6** wherein there are a plurality
of signal transmission carriers.

9. The apparatus of claim **8** wherein the plurality of signal
transmission carriers are wireless.

10. A method of redundant data transmission in a signal
path having an upstream server terminal and a downstream
Remote Terminal of proprietary host language protocol,
comprising:

a) packetizing and encrypting a data message;

b) adding a terminal controller header to the data message
to produce a terminal controller message having:
packet type, sequence number, and circuit identifier
information, as well as said data message;

c) tracking the state of transmission capability on each
channel, including counting failed transmissions, and
reporting the state of transmission capability;

d) adding a wireless carrier header to the terminal con-
troller message to create a wireless message;

e) transmitting the wireless message on a selected wire-
less carrier to the server terminal controller;

f) stripping the wireless header to recreate the terminal
controller message;

g) checking the server address in the terminal controller
message;

h) assigning the message to the addressed server channel
and stripping the terminal controller header; and

i) acknowledging receipt of message by the server termi-
nal controller to the remote terminal controller; and

j) opening and closing channel paths based on the receipt
of the message.

11. The method according to claim **10** further comprising
the step of validating the identity of the sender of the
message when receiving the transmitted message.

12. Apparatus for managing a wireless, secure, real-time,
network for a proprietary interactive data transfer network
having a remote terminal and a server, comprising:

**16**

a) means for transceiving data messages from the Remote
Terminal in a first format;

b) means for removing the first format from the data
message to create a bare message;

c) means for packetizing the bare message;

d) means for encapsulating the bare message;

e) means for encrypting the bare message;

f) means for adding a second message format to the bare
message to create a second format message;

g) means for selecting a signal transmission format for
sending of the second format message;

h) means for adding a third signal transmission format to
the second format message to create a signal transmis-
sion message;

i) means for sending the signal transmission message via
the selected signal transmission format;

j) means for monitoring reception of the translated data by
the server; and

k) means for opening or closing data paths based on the
monitored reception.

13. The apparatus of claim **12** wherein the means for
selecting a signal transmission format for sending of the
second format message further comprises means for select-
ing among a plurality of signal transmission formats.

14. The apparatus of claim **12** wherein the signal trans-
mission format is a wireless signal transmission format.

15. The apparatus of claim **14** wherein the means for
selecting a signal transmission format for sending of the
second format message further comprises means for select-
ing among a plurality of wireless transmission formats.

16. A method of transmission in a signal path having an
upstream server terminal and a downstream Remote Termi-
nal of proprietary host language protocol, comprising:

a) establishing a server terminal controller connection of
a first protocol with a server;

b) establishing a remote terminal controller connection of
a second protocol to the Remote Terminal;

c) receiving a Remote Terminal message;

d) packetizing and encrypting the data message;

e) selecting one from a plurality of signal paths based on
availability or reliability, or both, of packet transmis-
sion between the remote terminal and the server,
wherein each one of said plurality of signal paths is
associated with a different wireless format;

f) sending the message over the selected signal path; and

g) acknowledging receipt of message by the server ter-
minal controller to the remote terminal controller.

17. The method according to claim **16** wherein the first
and second protocols are different protocols.

18. The method according to claim **16** further comprising:

monitoring receipt of the acknowledging message by the
remote terminal controller.

19. The method according to claim **18** further comprising:

closing the selected signal path if no acknowledging
message is received.

* * * * *

## CERTIFICATE OF SERVICE

I certify that I served a copy of the foregoing brief on counsel of record on

September 2, 2014 by CM/ECF.  The following counsel of record were served by

CM/ECF:

Geoffrey P. Eaton
Direct: 202-282-5705
Email: geaton@winston.com
Fax: 202-282-5100
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006

John G. Day, Esq.
Direct: 302-654-1888
Email: jday@ashby-geddes.com
Ashby & Geddes P.C.
8th Floor
500 Delaware Avenue
PO Box 1150
Wilmington, DE 19899

Eric M. Goldstein
Direct: 202-282-5632
Email: egoldstein@winston.com
Fax: 202-282-5100
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006

Charles B. Molster, III, Esq.
Email: cmolster@winston.com
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006

Andrew Ryan Sommer
Direct: 202-282-5000
Email: asommer@winston.com
Winston & Strawn LLP
1700 K Street, NW
Washington, DC 20006

Daniel Leventhal
Direct: 713-651-8360
Email: dleventhal@fulbright.com
Fax: 713-651-5246
Norton Rose Fulbright
1301 McKinney
Suite 5100
Houston, TX 77010

Benjamin J. Schladweiler, Esq.,
Direct: (302) 576-1600
Email: bschladweiler@seitzross.com
Seitz Ross Aronstam & Moritz LLP
100 S. West Street
Suite 400
Wilmington, DE 19801

Joseph P. Zammit, Esq., Attorney
Direct: 212-318-3346
Email: joseph.zammit@nortonrosefulbright.com
Fax: 212-318-3400
Fulbright & Jaworski L.L.P.
33rd Floor
666 Fifth Avenue
New York, NY 10103

Richard Stephen Zembek, Attorney
Direct: 713-651-5283
Email: rzembek@fulbright.com
Fax: 713-651-5246
Norton Rose Fulbright
Suite 5100
1301 McKinney

Suite 5100
Houston, TX 77010

Shannon Jost, Attorney
Direct: 206-626-6000
Email: shannon.jost@stokeslaw.com
Fax: 206-464-1496
Stokes Lawrence, P.S.
800 Fifth Avenue
Suite 4000
Seattle, WA 98104

John W. Shaw, Esq., Litigation Counsel
Direct: 302-298-0700
Email: jshaw@shawkeller.com
Shaw Keller LLP
Suite 1120
300 Delaware Avenue
Wilmington, DE 19801

Karen Ann Jacobs
Direct: 302-658-9200
Email: kjacobs@mnat.com
Fax: 302-658-3989
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
PO Box 1347
Wilmington, DE 19899

Jennifer Ying
Direct: (302) 351-9243
Email: jying@mnat.com
Fax: (302) 225-2570
Morris, Nichols, Arsht & Tunnell LLP
1201 North Market Street
PO Box 1347
Wilmington, DE 19899

/s/ Daniel Kotchen
Daniel Kotchen
Michael von Klemperer
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC  20009
Telephone:  (202) 471-1995
Facsimile:  (202) 280-1128
dkotchen@kotchen.com
mvk@kotchen.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(7)(C), counsel for Appellant Mayfair hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  This brief contains 8,941 words.  This word count excludes materials attached in addendums.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5).  This brief has been prepared in a proportionally spaced typeface using Times New Roman 14-point font.

/s/ Daniel Kotchen
Daniel Kotchen
Michael von Klemperer
KOTCHEN & LOW LLP
1745 Kalorama Road NW, Suite 101
Washington, DC  20009
Telephone:  (202) 471-1995
Facsimile:  (202) 280-1128
dkotchen@kotchen.com
mvk@kotchen.com